Christopher J. **FARRELL,**
Plaintiff–Appellant,

v.

Corey **BURKE and Gregory Freeman,**
Defendants–Appellees.

**Docket No. 05–0169 CV.**

United States Court of Appeals,
Second Circuit.

Argued: Nov. 18, 2005.

Decided: May 31, 2006.

peals. *Kambolli,* 449 F.3d at 464 n. 18.

Eugene B. Nathanson, New York, New York, for Plaintiff–Appellant.

Ann P. Zybert, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, on the brief; Michael Belohlavek, Senior Counsel, Division of Appeals & Opinions, Daniel Chepaitis, Assistant Solicitor General, of counsel), New York, New York, for Defendants–Appellees.

Before: SOTOMAYOR and KATZMANN, Circuit Judges, and EATON, Judge.*

* The Honorable Richard K. Eaton, Judge, United States Court of International Trade, sitting by designation.

SOTOMAYOR, Circuit Judge.

The principal question presented by this appeal is whether a special condition of parole that prohibited the possession of "pornographic material" would have given notice to a reasonable parolee who had been convicted of sexual crimes involving minors, or his parole officer, that the condition prohibited possession of the book *Scum: True Homosexual Experiences,* which contains sexually explicit pictures and lurid descriptions of sex between men and boys. Plaintiff-appellant Christopher J. Farrell appeals from a December 9, 2004 judgment of the United States District Court for the Southern District of New York (Deborah A. Batts, J.) granting summary judgment to defendants-appellees Corey Burke and Gregory Freeman (collectively, "the State"), the New York State parole officers who arrested Farrell for violating his parole agreement when they discovered *Scum* and other publications in his apartment. Farrell brought suit pursuant to 42 U.S.C. § 1983, claiming that Burke and Freeman violated his constitutional rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment by imposing and enforcing the special condition.

Although a series of strongly-worded opinions by this Court and others suggest that the term "pornography" is unconstitutionally vague, we hold that *Scum* falls within any reasonable definition of pornography and that the parole condition is therefore not unconstitutionally vague as applied to Farrell's conduct. Because Farrell's as-applied vagueness challenge fails, and because he cannot demonstrate that the no-pornography condition threatened to chill the exercise of substantial constitutionally protected conduct, we do not reach the question of whether the condition was impermissibly vague on its face.

We also reject Farrell's First Amendment overbreadth challenge.

## BACKGROUND

### I. FARRELL'S CONVICTION, SENTENCE, AND AGREEMENT NOT TO POSSESS "PORNOGRAPHIC MATERIAL"

On several occasions between November 1988 and January 1990, Farrell paid four boys between the ages of 13 and 16 to have anal and oral sex with him at his home. On October 26, 1990, in New York state court, Farrell pled guilty to and was convicted of three counts of sodomy in the third degree. Farrell admitted that he had engaged in the charged conduct.

On the same day he pled guilty, Farrell was sentenced to three indeterminate prison terms of one to three years' imprisonment. He served almost four years and was conditionally released on parole on October 17, 1994, pursuant to New York Penal Law § 70.40(1)(b). His parole supervision was to expire on October 17, 1996. On October 18, 1994, the day after his release, Farrell agreed in writing to a set of parole conditions. These included standard conditions imposed on all parolees, *see* N.Y. COMP. CODES R. & REGS. tit. 9, § 8003.2(a)-(k), as well as special conditions imposed by Farrell's parole officer at the time, Clifford J. Parris. One of the special conditions stated: "I will not own or possess any pornographic material." Farrell read the conditions and attested by his signature that he understood them. He explained his failure to ask for clarification of the no-pornography condition in the following terms: "When I read the list of conditions, there was nothing about it that seemed confusing to me so I didn't ask questions about it."

Five months later, on March 28, 1995, Farrell signed a modified set of special conditions imposed by his parole officer at

that time, Roberto Martinez. It included the same special condition prohibiting the possession of "pornographic material" (the "Special Condition"). Again Farrell certified that he had read and understood the conditions, and again he asked for no clarification of the meaning of "pornographic material." On May 16, 1996, Farrell was placed under the supervision of a new parole officer, defendant Corey Burke. Burke told Farrell that the special conditions still applied, and again Farrell did not ask for clarification. While on parole, Farrell reported regularly to his parole officer. At no time between the signing of the parole agreement and his arrest did he ask his parole officer to clarify the meaning of the no-pornography condition.

## II. Farrell's Arrest For Possession Of "Pornographic Material"

On May 29, 1996, Burke went to Farrell's workplace and found that Farrell was not there. That night, Burke and defendant Gregory Freeman, Burke's supervising parole officer, went to Farrell's apartment looking for him. In Farrell's living room, which also served as his bedroom, the officers questioned Farrell about his whereabouts that day. During the questioning, the officers noticed three publications on a bookcase near Farrell's bed: a book entitled *Scum: True Homosexual Experiences,* edited by Boyd McDonald; the summer 1989 issue of a magazine called *My Comrade,* headlined "Gay Sex! The Shocking Truth!"; and an anthology entitled *Best Gay Erotica 1996.* Freeman looked through the books, saw sexually explicit pictures, and arrested Farrell for violating his parole agreement. He did not read the text of the publications prior to arresting Farrell.

*Scum* contains about twenty-five pictures of men. In all but three of the pictures, the men are nude. In about half of the pictures, the men's penises are erect, and some of the men appear to be touching themselves. A disclaimer on page four of *Scum* states that "[a]ll models are over 18." The State has not challenged this disclaimer.

The text of *Scum* consists almost entirely of erotic stories describing sexual encounters in intimate detail. Because this case turns on whether the contents of *Scum* are so inarguably "pornographic" as to fit within any reasonable definition of that term, it is necessary to describe with some thoroughness what the book depicts and how it is depicted. The text on the back cover of *Scum* gives a fair picture of its contents:

> Scum is the thirteenth in Boyd McDonald's best-selling series of *Straight to Hell* chapbooks. Like earlier titles, (*Flesh, Meat* [,] *Cum, Juice, Skin, Wads, Cream, Smut, Filth, Sex, Raunch, Lewd* ), *Scum* contains dozens and dozens of true homosexual experiences. Men from all over write the naked, shameless truth in stories like, "Youth Displays Shit–Hole for Dog to Sniff, Lick," "Soldiers Grope Each Other in Back Row of Theater," "Pushes Partner's Face into Puddle of Piss," "Army Officer Sniffs Soldier's Jockey Shorts," "Suck Stops on the Highways of Vermont," "US Marine Displays Dick, Butt to Cubans," "Wipes Asshole With His Tongue, Then Screws It With His Tool," and "Cleric Fucks Army Vet's Mouth." Plus there's Boyd McDonald's incomparable "Sex in the News," and plenty of sexy photos, making *Scum* one of the hottest reads ever!

The stories that compose *Scum* contain virtually no descriptions of anything other than sex. The "Sex in the News" sections referenced on the back cover include "news" stories such as "Man Sucks Dick In

Front of Café," *id.* at 66, and "Man, 27, Prowls Naked in Ashtabula." *Id.* at 98.

A number of the stories in *Scum* explicitly describe sex between men and boys. One involves a male "in his late teens" and another male who "looked to be about 60" having sex with multiple other men in a theater bathroom. *Id.* at 20–22. Another story involves a boy of 14 "being taken into and kicked out of homes of various sugar daddies." *Id.* at 27. A third story notes a news story about a 13–year–old boy who impregnated his 17–year–old baby sitter. *Id.* at 31. The author suggests that he would like to pay the 13–year–old for sex:

> If I was the baby sitter for a 13–year–old boy who wanted to get his rocks off, I could provide him with the same sort of pleasure—or better—and the consequences would be that he would not have to pay child support, he might be a little richer himself, and a child would not be produced.

*Id.* Elsewhere, a narrator remembers "[w]hen [I was] 9 or 10, my first major mystery occurred. Upon rounding a corner, I found Red spitting on his 'thing' . . . . So my neighbor Red explained the mystery, instructing me how to pump myself up and down." *Id.* at 81. Other narrators appear to take particular pride in recounting the significantly lower ages of their partners. "I was 49 yrs., he 20–1/2 and a great bed partner." *Id.* at 86. "I was 52 and he only 26." *Id.* at 88. Another narrator regrets that one partner has fully grown up ("He is 25 now and has lost his earlier cuteness") before turning to describe another partner who "first started having sex—and liking it—with his stepfather when he was 9 years old and has been turning tricks since his teens." *Id.* at 102.

Numerous stories in *Scum* describe sex between boys. In the first story in the book, for example ("He Liked to Fuck My Face For Half an Hour"), the narrator remembers a series of sexual experiences that occurred "when [he] was a teenager," *id.* at 7. "Sometimes we would drive around the hills and he would pretend like he was kidnapping me, tie up my body, and then fuck my face . . . ." *Id.* at 8. In another story, the author says he had "sucked around from age six or seven, sucking all my elementary school male class mates, then on into High School . . ." *Id.* at 85. Representative stories involving underage boys include a story called "Milwaukee Prodigy, 16, Takes On Two at a Time," *id.* at 11, and a story about two boys at summer camp having sex called "His Dick Was Sticking Out of His Pajamas." *Id.* at 14–15. *Scum* graphically describes boys in their early teens having sexual encounters in pools, *id.* at 40–41, in locker rooms, *id.* at 42–43, in the woods, *id.* at 47–48, in garages, *id.* at 57–58, and in France, where one narrator remembers "when [he] was 16" and his partner "was 11–1/2," *id.* at 98–99. *Scum* contains other examples of stories involving young boys; rather than recount them here, we merely note that the examples cited thus far are all taken from the first half of the book.

The other two publications, *My Comrade* and *Best Gay Erotica 1996*, are less obviously prurient in nature. *My Comrade* is satirical; although it deals with sex, it appears intended more to amuse than to arouse. It contains a few depictions of nude men, but they are usually in a satirical context, as with the drawing of a furry (but obviously male) naked creature accompanying the article entitled "I Had Gay Sex—With Bigfoot!"[1] Erect penises are visible in two photographs in the book, but in each case the photograph is

---

1. The pages of *My Comrade* are not numbered.

part of a collage in which the sexual images are juxtaposed with other non-sexual images, and the caption identifies local art galleries in which the artist's work has been displayed. The intent of these images seems more artistic than prurient. The rest of the magazine, containing articles like "Why I Love Disco" and "Underground in the Land of the Breeders!", is a lighthearted treatment of issues relating to sex and sexuality.

*Best Gay Erotica 1996* is not in the record in this case. At some point after the arrest, Burke decided that, because the book did not contain any pictures, it was not pornography. It therefore played no role in Farrell's parole revocation hearings.

### III. FARRELL'S PAROLE REVOCATION AND SUBSEQUENT PROCEEDINGS

On June 7, 1996, a preliminary parole revocation hearing was held before a hearing officer appointed by the Board of Parole. At the hearing, Officer Burke described the events leading up to Farrell's arrest and testified that the condition of parole had been imposed by a prior parole officer and continued in effect after Burke took over Farrell's case. Burke further explained that as Farrell's parole officer he had the discretion to impose special conditions if necessary, but that in this case he had simply followed the conditions set by the prior officer, which he understood to be standard for sex offenders.

Burke also explained that he had deemed *Scum* and *My Comrade* pornographic because "[t]hey have pictures of nude men in them." On cross-examination, Farrell's counsel asked whether it was Burke's "conclusion then that any pictures of nude men are pornographic." Apparently referring to *My Comrade*, Burke replied: "I wouldn't say all pictures of nude men are pornographic but I believe these are pornographic based upon the title and also based upon the positions that these nude men are in. Some of these pictures here are pornographic. Gay Sex is the title." Farrell's counsel then asked about specific examples:

MR. NATHANSON: Are you saying, for example, that that condition of parole would prohibit Mr. Farrell from possessing, say, Playboy magazine?

P.O. BURKE: Yes.

MR. NATHANSON: Are you saying that that condition of parole would prohibit Mr. Farrell from possessing a photograph of Michelangelo['s] David?

P.O. BURKE: What is that?

MR. NATHANSON: Are you familiar with that sculpture?

P.O. BURKE: No.

MR. NATHANSON: If I tell you it's a large sculpture of a nude youth with his genitals exposed and visible, does that help to refresh your memory of what that is?

P.O. BURKE: If he possessed that, yes, he would be locked up for that.

MR. NATHANSON: Would that definition of pornographic include written materials that do not contain pictures?

P.O. BURKE: No.

MR. NATHANSON: Definitely not?

P.O. BURKE: No. I wouldn't believe that this is pornographic [indicating *Best Gay Erotica 1996* ].... There is no pictures in it.

MR. NATHANSON: Leaving aside Best Gay Erotica 1996, are there any books that contain no pictures that you would have arrested Farrell for, if it had no pictures?

P.O. BURKE: If it had just words in it, no pictures, I probably would not arrest him. I would run it past my

supervisor and let him make that decision.

Burke testified that he believed *Scum* and *My Comrade* to be obscene under New York law, but said he did not know whether something could be pornographic without being obscene. The hearing officer found probable cause to believe that Farrell had violated his parole, and Farrell was held for a final hearing.

Both Farrell and Burke testified at the final revocation hearing on July 18 and 22, 1996. At this hearing, Farrell testified that he had purchased *Scum* in 1995 and that he did not think buying or possessing *Scum* violated his conditions of parole. He acknowledged that he had been aware of the no-pornography condition, but testified that he thought it related to "[t]he kind of stuff that you would get in an adult book store or an x-rated movie or a book that has pictures of people engaging in sex activity where the whole purpose of the book is to arouse your sexual appetite." Asked again what he would think of as "a pornographic book," Farrell replied, "[a] book that has pictures of people engaging in sexual activity, a videotape of a similar nature and a book whose sole purpose is to pander with people's sexual arousal."

As to *Scum* and *My Comrade*, Farrell testified as follows:

> Well, I didn't think they were pornographic materials because—well, My Comrade, I had purchased before I went to prison and I had it before that, so it wasn't—when they said pornographic materials, that's not the victim of my conscience of that [sic] because it's a satirical magazine that looks at popular culture and forms of popular culture and used to poke fun at, you know, existing conditions, but I didn't think it was used as an erotic book, much less a pornographic book. Scum, although the erotic reading is centered to (inaudible), it's

not what I think [of] as pornography because it's not (inaudible), exaggerated or one-minded depictions of sexual life whereas Scum makes an attempt to get real gender material so you can have history of the way homosexuals lead their lives and about a third of the book is dedicated to the editor's analysis of the way sexual behavior is reported in mainstream newspapers and used as a hypocrites [sic] of society about the difference between people, what people say about sex and between the way they actually behave and the attitudes about society, about homosexuality versus heterosexuality. So, I didn't think they were pornographic books.

Farrell presumably referred to the "Sex in the News" sections discussed above, and to the author biography at the end of the book, which states:

> "I consider this history, not pornography," Boyd says of his books .... "It's very serious work. A lot of people in the gay press put it down as just being jack off, but I don't write it for that. I consider these books the true history of homosexual desire and experience. Any gay publications that do not deal with the elemental discussion of gay sexual desire are not serious—they are frivolous."

*Scum* 199. Although the book proclaims the cultural value of reprinting graphic stories of sexual encounters in this brief author biography and in a one-page introduction, the rest of *Scum* contains only the stories and accompanying photographs.

The state administrative law judge ("ALJ") presiding over the hearing concluded that *My Comrade* was not pornographic but that *Scum* was. The ALJ stated:

> While "My Comrade" may be considered a satirical magazine depicting the gay lifestyle the same cannot be said of

"Scum." This book contains numerous pictures [of] frontal male nudity, erect penises and males fondling their genitals. The stories in the book mainly describe explicit sexual encounters between males. Most disturbing is the numerous stories which describe sexual encounters involving underage males. I find that the parolee whose underlying [offense] involves sexual activity with underage males was aware that materials containing such descriptions were pornographic and prohibited. I therefore find that the parolee violated his parole.

Farrell's parole was revoked, and he was ordered held until the expiration of his maximum sentence. The ALJ's decision was affirmed without opinion by the Commissioner of Parole on August 16, 1996. In all, Farrell was incarcerated on account of the parole revocation from May 29, 1996 until October 17, 1996.

On June 12, 1996, between the time of his preliminary and final revocation hearings, Farrell filed a writ of habeas corpus in State Supreme Court, Bronx County, *see People ex rel. Christopher Farrell v. Michael P. Jacobson, et al.* (Index No. 16921/97 S.Ct. Bronx County), challenging the parole revocation proceedings. On October 17, 1996, the day of Farrell's release, the petition was withdrawn and the proceeding was dismissed. Farrell did not seek to overturn the revocation by initiating further proceedings in state court.

Thus, the legality of Farrell's parole revocation has never been adjudicated in a state judicial proceeding.

On July 31, 1997, Farrell instituted the present action under 42 U.S.C. § 1983 in the United States District Court for the Southern District of New York. He sought a declaration that the imposition of the special condition was unconstitutional under the First and Fourteenth Amendments, damages against Burke for imposing the special condition, and damages against Burke and Freeman for arresting him.

On October 21, 1998, the district court granted the defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) Farrell's claims based on the First Amendment, holding that Farrell had no unrestricted right to possess pornography. *See Farrell v. Burke,* No. 97 Civ. 5708, 1998 WL 751695, 2, 1998 U.S. Dist. LEXIS 16896, at *5 (S.D.N.Y. Oct. 28, 1998). On December 8, 2004, the district court granted summary judgment for the defendants on the remaining claims. *See Farrell v. Burke,* No. 97 Civ. 5708, 2004 WL 2813175, 2004 U.S. Dist. LEXIS 24658 (S.D.N.Y. Dec. 8, 2004). The district court held that Burke could not be personally liable for the imposition of the special condition because he did not impose it, and that Farrell could not bring a facial vagueness challenge to the special condition because it did not sufficiently implicate his First Amendment rights.[2]

---

**2.** The district court also held that Farrell's § 1983 claim was not barred by the favorable termination requirement of *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (holding that when a prisoner's § 1983 action would establish the unlawfulness of the prisoner's conviction or sentence, the action will not lie unless the conviction has been called into question by an executive order, a state tribunal, or a federal writ of habeas corpus), because Farrell is no longer in custody and thus could not petition for a writ of habeas corpus. *See Jenkins v. Haubert,* 179 F.3d 19, 21 (2d Cir.1999) (stating that *Heck* and later cases "do not bar a § 1983 claim challenging the conditions of a prisoner's confinement where the prisoner is unable to challenge the conditions through a petition for federal habeas corpus"). We do not review this finding because the State has not challenged it in this appeal. *See Bano v. Union Carbide Corp.,* 273 F.3d 120 (2d Cir.

The court also held that the ALJ's finding that Farrell was aware that *Scum* violated the special condition was entitled to preclusive effect under the doctrine of collateral estoppel and that it therefore could not reach the merits of Farrell's as-applied vagueness challenge. Farrell timely appealed.

## DISCUSSION

■ Farrell's challenge implicates two fundamental constitutional principles. On the one hand, the state has a duty to give clear notice to its citizens of the behavior that will subject them to criminal punishment. Undue vagueness in the law is unfair to the citizens who must rely on it and gives too much discretion to the officials who enforce it. No person should have to stake his or her liberty on another person's whims or aesthetic judgment, as Farrell alleges he was forced to do.

On the other hand, the courts of the United States are not often willing to hear claims based on third-party or *jus tertii* standing, in which litigants argue the unconstitutionality of hypothetical enforcements of the law rather than the actual enforcement that triggered the litigation. There are exceptions to the rule against *jus tertii* standing, but courts tend to invoke these exceptions only in situations where a true threat to constitutional rights exists. This means, of course, that there will be some situations in which an unconstitutionally vague regulation is allowed to stand because the enforcement of that regulation caused no direct constitutional injury to the parties before the court—an unfortunate but necessary consequence of courts' reluctance to adjudicate broad constitutional challenges. Farrell's case requires us to examine the ways in which the constitutional prohibition of vague laws

2001) (declining to reach an issue not raised

and the rules restricting *jus tertii* challenges interact.

Farrell makes two principal claims on appeal: that the Special Condition prohibiting possession of "pornographic material" was unconstitutionally vague as applied to the material that caused his parole to be revoked, and that the Special Condition was unconstitutionally vague and overbroad on its face. Before we consider Farrell's vagueness and overbreadth challenges, however, we must resolve a few threshold questions.

## I. THRESHOLD MATTERS

### A. Collateral Estoppel

The State, like the district court, asserts that Farrell's due process claim must be dismissed because the doctrine of collateral estoppel precludes him from challenging the determination of his final parole revocation hearing, as affirmed by the Division of Parole.

■ "[W]hen a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (internal punctuation, citation and quotation marks omitted).

Under New York law, collateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate. Additionally, the issue

by the parties on appeal).

that was raised previously must be decisive of the present action.... This additional requirement makes New York collateral estoppel law slightly different from federal collateral estoppel law.

*Curry v. City of Syracuse,* 316 F.3d 324, 331 & n. 4 (2d Cir.2003) (internal citations and quotation marks omitted). *See De-Cintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 118 & n. 13 (2d Cir.1987) (holding that a § 1983 claim seeking damages for alleged violation of Fourteenth Amendment rights was precluded when a dispositive issue had been fully litigated before a state agency).

▆ In this case, the issue resolved by the ALJ was neither identical to the issues raised by Farrell's constitutional claims in this case nor dispositive of them. It is true that the ALJ concluded that Farrell had actual notice that *Scum* was pornographic. We do not question that finding here, but a finding of actual notice is not dispositive of Farrell's constitutional claims. Vagueness challenges—as-applied and facial alike—require an inquiry into whether the challenged regulation provided adequate standards to limit the discretion of law enforcement officers. *See United States v. Nadi,* 996 F.2d 548, 550 (2d Cir.1993). The conclusion that the regulation provided minimal guidelines for enforcement does not follow mechanically from a finding that the plaintiff had actual notice of the regulation's scope. Furthermore, as discussed below, an as-applied vagueness challenge requires courts to determine "whether the statute gives *the person of ordinary intelligence* a reasonable opportunity to know what is prohibited," *id.* at 550 (quotation marks and alteration omitted; emphasis added), not whether the actual plaintiff knew that his or her conduct was prohibited. Because both of these inquiries are objective, not subjective, actual notice should not be given decisive weight in answering them.

Moreover, the ALJ's finding that Farrell had actual notice may have been just as much an assessment of Farrell's credibility as it was a finding that the regulation was objectively clear. In other words, the ALJ may simply have decided not to believe Farrell when he claimed to have thought that *Scum* was not pornographic. Because the ALJ did not explicitly address the question of vagueness, it is difficult to determine the extent to which the objective clarity of the Special Condition was considered relevant to the final revocation decision. *See Jim Beam Brands Co. v. Beamish & Crawford Ltd.,* 937 F.2d 729, 734 (2d Cir.1991) ("If an issue was not actually decided in a prior proceeding, or if its decision was not necessary to the judgment, its litigation in a subsequent proceeding is not barred by collateral estoppel."). We cannot say that the vagueness issue "has necessarily been decided in the prior action and is decisive of the present action." *Schwartz v. Pub. Adm'r of the City of Bronx,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 246 N.E.2d 725, 729 (N.Y.1969).

Nor is actual notice determinative of overbreadth challenges, because an overbreadth challenge inquires into the constitutionality of the regulation as applied to hypothetical third parties, without regard to its constitutionality as applied to the plaintiff. Because none of the constitutional claims before us depends on the question of actual notice, the doctrine of collateral estoppel does not preclude those claims.

### B. Burke's Personal Involvement in the Imposition of the Special Condition

Farrell challenges two distinct state actions: the imposition of the Special Condition and its enforcement. The district

court held that Farrell was not allowed to challenge the imposition of the Special Condition in this action because the defendants were not personally involved in its imposition. *Farrell,* 2004 WL 2813175 at *6–7, 2004 U.S. Dist. LEXIS 24658, at *18–19. The court did not discuss whether Officer Freeman was personally involved in the imposition of the condition, but we assume that the court intended this finding as well, because it dismissed Farrell's entire "claim for monetary and injunctive relief against the imposition of the Special Condition." *Id.* 2004 WL 2813175 at *7, 2004 U.S. Dist. LEXIS 24658 at *19.

 "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation and internal quotation marks omitted). Because "personal involvement is a question of fact[,] we are governed by the general rule that summary judgment may be granted only if no issues of material fact exist and the defendant[ ] is entitled to judgment as a matter of law." *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

 The district court reasoned that Burke was not personally involved in the imposition of the Special Condition because the record indicated that a prior parole officer, Martinez, imposed the Special Condition, while Burke merely continued it. "At most, Parole Officer Burke advised Plaintiff that the Conditions imposed by Parole Officer Martinez were being continued; however, there is no evidence that he altered the rules or conditions of parole." *Farrell,* 2004 WL 2813175 at *7, 2004 U.S. Dist. LEXIS 24658, at *18–19. The district court erred, however, in failing to note that Burke and Freeman actually enforced the Special Condition by arresting Farrell, which

would clearly constitute personal involvement in any violation of Farrell's constitutional rights.

## II. VAGUENESS AND OVERBREADTH

Farrell makes three constitutional challenges to the Special Condition under which he agreed not to possess "pornographic materials." He argues first that the Special Condition was unconstitutionally vague as applied to him, meaning that, as to his possession of *Scum,* the Special Condition failed to give him adequate notice of the conduct that was prohibited by law and created a danger of arbitrary enforcement. Second, Farrell argues that the Special Condition was unconstitutionally vague on its face, i.e., that *in general* it failed to give a reasonable person notice as to what was prohibited and created a danger of arbitrary enforcement. Finally, he argues that the Special Condition was unconstitutionally overbroad in violation of the First Amendment, i.e., that even if the Condition can be enforced in some cases without violating the First Amendment, so many of its applications would violate the First Amendment that it creates a substantial chilling effect and should be struck down on its face. We review the question of whether the district court properly granted summary judgment to the defendants on these questions *de novo. See Advance Pharm., Inc. v. United States,* 391 F.3d 377, 395 (2d Cir.2004). We begin with Farrell's vagueness challenges.

### A. The Vagueness Doctrine

 The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Among the most fundamental protections of the Due Process Clause is the principle that "[n]o one may be required at peril of life, liberty or property

to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939). Because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). But "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (citations omitted).

■ In *Grayned*, the Supreme Court explained the purposes of the vagueness doctrine:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than

if the boundaries of the forbidden areas were clearly marked.

408 U.S. at 108–09, 92 S.Ct. 2294 (internal citations, alterations and quotation marks omitted).

■ The vagueness doctrine is a component of the right to due process. But as *Grayned* suggests, vagueness in the law is particularly troubling when First Amendment rights are involved. "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

■ "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Thus, all vagueness challenges— whether facial or as-applied—require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement.

■ Because the permissibility of a facial challenge sometimes depends upon whether the challenged regulation was constitutional as applied to the plaintiff, "[a] court should ... examine the complainant's conduct before analyzing other hypothetical applications of the law." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Accordingly, we begin with Farrell's claim that the Special Condition was unconstitutionally vague as applied to his possession of *Scum*.

### B. Farrell's As–Applied Vagueness Challenge

■ This Court explained the analysis governing as-applied facial challenges in *United States v. Nadi*, 996 F.2d 548 (2d Cir.1993). "When the challenge is vagueness 'as-applied', there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Id.* at 550 (internal citations, alterations and quotation marks omitted).

#### 1. Whether a Reasonable Person Would Have Known That Scum Was Prohibited

■ As to whether the Special Condition provided adequate notice in this case, Farrell points out that the term "pornography" is notoriously subjective and elusive in meaning. Indeed, a number of cases in this Court and others have held or strongly suggested that the term is inherently vague.

The Second Circuit has addressed the question of pornography-related conditions of supervised release in two recent cases. *See United States v. Simmons*, 343 F.3d 72 (2d Cir.2003); *United States v. Cabot*, 325 F.3d 384 (2d Cir.2003). Both held that the defendants had adequate notice of the meaning of "pornography" because the law under which they were convicted, 18 U.S.C. § 2256, provided an extensive and detailed definition of the term "child pornography,"[3] from which the defendants should have been able to divine the meaning of "pornography" in their conditions of supervised release. *See Simmons*, 343 F.3d at 82; *Cabot*, 325 F.3d at 385.

In *Simmons*, we stated that the definition of child pornography, set forth for the defendant in the statute he was convicted of violating, "avoids reference to subjective standards and is sufficiently specific to give adequate notice as to what conduct violates a prohibition on pornographic material." 343 F.3d at 82. But we explained at length why we believed that "pornography" was vague if it was not tied to a specific definition:

> For purposes of evaluating artistic or cultural merit, the term "pornography" is notoriously elusive. In that context, determining whether material deserves the label of pornography is a subjective, standardless process, heavily influenced by the individual, social and cultural ex-

---

3. The federal statute provided as follows:
(8) "child pornography" means any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.

18 U.S.C. § 2256(8). It further provided that:
(B) For purposes of subsection 8(B) of this section, "sexually explicit conduct" means-
(i) graphic sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex, or lascivious simulated sexual intercourse where the genitals, breast, or pubic area of any person is exhibited; (ii) graphic or lascivious simulated; (I) bestiality; (II) masturbation; or (III) sadistic or masochistic abuse; or (iii) graphic or simulated lascivious exhibition of the genitals or pubic area of any person.
18 U.S.C. § 2256(2).

perience of the person making the determination. As we observed in *Cabot,* "One man's pornography may be another's keepsake." 325 F.3d at 385 (quoting *Giano v. Senkowski,* 54 F.3d 1050, 1056 (2d Cir.1995)). According to some, Vladamir Nabokov's novel *Lolita,* or the film adaptation of the book, or "Edouard Manet's *Le Dejeuner sur L'Herbe* is pornographic (or even some of the Calvin Klein advertisements)." *United States v. Loy,* 237 F.3d 251, 264 (3d Cir.2001). Whether Sally Mann's photographs of her three prepubescent children, sometimes nude or partially clothed, or Robert Mapplethorpe's explicit images of sexual practices, fall within the scope of pornography are matters of considerable debate. *Id.* at 81. *Simmons* issued a strong warning to district courts to incorporate a definition of pornography into future conditions of supervised release: "While it is unnecessary for district courts imposing such a prohibition to explicitly reference this statutory definition of pornography, we urge them to do so in future cases, particularly since in other contexts the term is inherently vague." *Id.* at 82. This language strongly suggests that the term "pornography" is "inherently vague" for defendants whose statute of conviction does not define it.

Unlike the statute at issue in *Cabot* and *Simmons,* Farrell's statute of conviction did not involve pornography, so it provided him no clarification of the scope of the Special Conviction. Where the offense of conviction does not involve pornography, a statutory definition of that term in a criminal statute that the defendant has never encountered no more provides notice of the meaning of that term than does any other definition of pornography. *See United States v. Loy,* 237 F.3d 251, 263 n. 4 (3d Cir.2001) ("Although federal law contains a definition of child pornography, *see*

18 U.S.C. § 2256, the release condition imposed here cannot be presumed to track that statute, as the condition explicitly prohibits 'legal adult pornography.' "). We thus may not look to federal law for clarification of the meaning of Farrell's Special Condition.

Farrell also relies on a case from the Third Circuit holding unconstitutionally vague a parole condition similar to his own. As the Third Circuit observed:

[T]he term "pornography," unmoored from any particular statute, has never received a precise legal definition from the Supreme Court or any other federal court of appeals, and remains undefined in the federal code. The Supreme Court in *Miller* used only a footnoted dictionary reference for its own definition. *See Miller,* 413 U.S. at 19 n. 2, 93 S.Ct. 2607 (defining pornography as "a description of prostitutes or prostitution" with a secondary meaning of "a depiction (as in writing or painting)) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement" (quoting Webster's Third New International Dictionary (1969)).

*Loy,* 237 F.3d at 263. The Third Circuit discussed a number of items which might or might not be considered pornography, from *Lolita* to Calvin Klein advertisements to W.B. Yeats's poem "Leda and the Swan," and observed that "[a]lthough the propriety of affixing the title 'pornography' to any of these items could foster debate, the debate would remain undecided. Put differently, with regard to 'pornography' rather than 'obscenity,' we do not 'know it when we see it.' " *Id.* at 264.

The Ninth Circuit in *United States v. Guagliardo,* 278 F.3d 868 (9th Cir.2002), held a special condition prohibiting pornography unconstitutionally vague even

where the offense of conviction was child pornography (under the same statute which we held in *Cabot* and *Simmons* gave notice of the meaning of the term).

> [A] probationer cannot reasonably understand what is encompassed by a blanket prohibition on "pornography." The term itself is entirely subjective; unlike "obscenity," for example, it lacks any recognized legal definition. The district court here could not itself define the term, stating only that "The Court won't have any trouble defining it if [Guagliardo] violates it." This after-the-fact definition, however, leaves Guagliardo in the untenable position of "discover[ing] the meaning of his supervised release condition only under continual threat of reimprisonment, in sequential hearings before the court." *Loy*, 237 F.3d at 258.
>
> The government asserts that any vagueness is cured by the probation officer's authority to interpret the restriction. This delegation, however, creates "a real danger that the prohibition on pornography may ultimately translate to a prohibition on whatever the officer personally finds titillating." *Id.* at 266. A probation officer could well interpret the term more strictly than intended by the court or understood by Guagliardo.

*Id.* at 872 (additional citations omitted); *cf. United States v. Phipps*, 319 F.3d 177, 193–94 (5th Cir.2003) (upholding on plain error review a condition of supervised release that prohibited defendants from possessing "sexually oriented or sexually stimulating materials" and from patronizing any place where such material or entertainment is available, because the second condition narrowed the first).[4]

There is also New York caselaw suggesting that the term "pornography" is impermissibly vague. The Court of Appeals has held that a warrant authorizing a search for "obscene, indecent and 'hard core pornographic' pictures, photographs and motion picture films" was not particular enough to satisfy the Fourth Amendment. *People v. Rothenberg*, 20 N.Y.2d 35, 281 N.Y.S.2d 316, 228 N.E.2d 379, 380 (N.Y.1967). The court noted that "[t]he specifying of 'hard core pornography' is not enough to define specifically in a search warrant what the police are to look for and seize." *Id.* at 381. As Farrell's brief notes, if the word "is vague when restrictively modified, then it certainly must be too vague when unmodified."

The State asks us to reject the holdings of these cases, arguing that the meaning of "pornography" "is determinable by application of value-free criteria," unlike the term "obscenity," which it believes "is a morally loaded word." The State offers the following "value-free criteria" by which it believes pornography may be recognized: "if material depicts sexual (as opposed to non-sexual) conduct and is designed to cause sexual excitement, it is 'pornography.'"[5] It draws this definition

---

**4.** At least one state appellate court has also found unconstitutionally vague a condition prohibiting a probationer "from possessing pornographic or sexually explicit materials." *Smith v. State*, 779 N.E.2d 111, 117–18 (Ind. App.2002); *see also Foster v. State*, 813 N.E.2d 1236, 1237, 1239 (Ind.App.2004) (holding a condition vague where it ordered sexual offender not to "possess or view any pornographic or sexually explicit material (including: books, magazines, computer images, internet files, photographs, VCR cassettes, film or other materials)" because "the condition of probation does not define sexually explicit or pornographic").

**5.** The Third Circuit has aptly explained why this is not true:

> [A]lthough the scope of the term "obscenity" has been exhaustively examined (and even the term "indecency" has been given a specific definition by the [Federal Communications Commission] ), the term "por-

from the dictionary, *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1767 (1981), and from what it sees as "common[ ]sense." [6]

The State fails to note that dictionaries commonly offer an alternative definition of pornography: "Lurid or sensational material." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000) (citing Morris Dickstein, *Alive and 90 in the Jungles of Brazil*, N.Y. TIMES, May 2, 1982 (book review) ("Recent novels about the Holocaust have kept Hitler well offstage ... to avoid the merely lurid, the pornography of the era ....")). The sense of "pornographic" that implies "lurid or sensational," of course, is nothing more than a value judgment, and this sense is deeply intertwined with the sense of the word that connotes lasciviousness. For example, one's views about whether the photographs of Robert Mapplethorpe are "pornographic" depend almost entirely on whether one sees the work as having artistic merit. In general usage, the distinction between "erotica" and "pornography" is precisely a distinction of value.[7]

The State's definition of pornography as material depicting sexual conduct and "designed to cause sexual excitement," if applied, would cover not only materials such as *Scum* but also popular television shows such as *Sex and the City*, books such as *Lady Chatterly's Lover*, and the entire "romance" section of most bookstores. Indeed, the State's definition of "pornography" seems to include no element of sexual explicitness or offensiveness, so it would apparently also include virtually all television programs in which attractive characters are shown romantically entangled, many fashion magazines and lingerie catalogs, and a high percentage of the music videos on MTV. The State's definition would certainly cover *Best Gay Erotica*

nography," unmoored from any particular statute, has never received a precise legal definition from the Supreme Court or any other federal court of appeals, and remains undefined in the federal code. *Loy*, 237 F.3d at 263.

**6.** A similar definition appears as one possible meaning of "pornography" in a footnote in the Supreme Court opinion in *Miller v. California*, 413 U.S. 15, 20 n. 2, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973): "The word ["pornography"] now means '1: a description of prostitutes or prostitution[;] 2: a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement.'" *Id.* at 19 n. 2, 93 S.Ct. 2607 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1969)). *Miller* dealt with constitutional limits on the regulation of obscenity; in the quoted footnote, the Supreme Court was noting merely that certain materials at issue in that case, which "primarily ... consist of pictures and drawings very explicitly depicting men and women in groups of two or more engaging in a variety of sexual activities, with genitals often prominently displayed," were pornographic. *Id.* at 18, 93 S.Ct. 2607; *see also id.* at 20 n. 2, 93 S.Ct. 2607. It appears that the materials at issue in *Miller*, like *Scum*, were within the core of what anyone would consider pornographic. The fact that the Supreme Court referred to the dictionary definition of pornography—which, as discussed above, would encompass an almost absurdly broad class of publications if literally applied—illustrates the difficulty of finding a workable definition of the term.

**7.** Presumably, no one in the present case could reasonably have believed that the phrase "pornographic materials" in the Special Condition was used merely to mean "lurid or sensational material" and nothing more; no reasonable person in Farrell's position would have believed that the Special Condition prohibited paperback horror novels or tabloid newspapers that focus on lurid and sensational topics. But the fact that the meaning of "pornography" is heavily dependent upon individual tastes supports Farrell's argument that it is inherently vague, because a term whose definition varies widely according to the individual preferences of the user can hardly suffice to give notice or cabin discretion for purposes of the criminal law.

*1996,* which the enforcing officers in this case rejected as non-pornographic. In short, the State could hardly have done more to illustrate the vagueness of "pornography" than to assert that the term covers all material that "depicts sexual . . . conduct and is designed to cause sexual excitement."

We do not disagree with Farrell's argument that the term "pornography" is inherently vague, nor do we in any way challenge the earlier cases from this Circuit and others finding that the term is insufficient to give notice to a reasonable offender of what material sweeps within its prohibition. But to prevail on an as-applied challenge, Farrell must persuade us that he lacked notice that the particular materials that he was punished for possessing were proscribed. Whether or not the term "pornography" is inherently vague, *Scum* fits within any reasonable understanding of the term.

Farrell points out, quite rightly, that he would have encountered a bewildering panoply of definitions of "pornographic" had he tried to find out what the term meant as it was used in the Special Condition. None of the parties, witnesses or relevant government entities seemed to agree on the meaning of the term. Indeed, the facts of Farrell's case so effectively illustrate the wide variety of understandings of "pornography" to which reasonable people may subscribe that our sister circuits have cited the district court's opinions and recounted the various understandings expressed by the state officials in this case as support for their own findings that the term is impermissibly vague. *See Loy,* 237 F.3d at 264; *Guagliardo,* 278 F.3d at 872. Unlike the Third and Ninth Circuits, however, we are not presented with a pre-enforcement challenge to a parole condition. Even if the condition is inherently vague,

therefore, we must begin by considering its clarity as to the way it was enforced against Farrell. Although the actors in Farrell's case had divergent views on what constituted "pornography" and why, an examination of those views reveals that all of their definitions had one thing in common: *Scum* fit comfortably within each of them.

Farrell claimed to believe that the word "pornography" included only materials designed solely to arouse sexual appetite. He stated that he believed pornography was "[t]he kind of stuff that you would get in an adult book store or an x-rated movie or a book that has pictures of people engaging in sex activity where the whole purpose of the book is to arouse your sexual appetite." Asked, "What would you think of as a pornographic book?", Farrell responded: "A book that has pictures of people engaging in sexual activity, a video tape of a similar nature and a book whose sole purpose is to pander with people's sexual arousal." Farrell conceded that there were "pictures of men with erections in [*Scum* ]," but denied that this made the book pornographic, characterizing it as "not . . . exaggerated or one-minded depictions of sexual life . . . [It] makes an attempt to get real gender material so you can have history of the way homosexuals lead their lives."

We do not agree with Farrell's characterization of *Scum* as "real gender material." Aside from a few paragraphs at the beginning and end of the book, *Scum* makes little pretense of being a work of sexual ethnography. Pictures of nude, aroused men may not always render something "pornographic"—as discussed above, reasonable people disagree about the nature of Robert Mapplethorpe's pictures—but the pictures in *Scum* appear alongside stories that are as wholly designed "to arouse your sexual appetite" as any we can

imagine. *Scum* thus fits precisely within Farrell's definition of "pornography" as "a book that has pictures of people engaging in sex activity where the whole purpose of the book is to arouse your sexual appetite."

■ We note that "[i]n determining the sufficiency of the notice[,] a statute must of necessity be examined in the light of the conduct with which a defendant is charged." *Birzon v. King*, 469 F.2d 1241, 1243 n. 4 (2d Cir.1972). Farrell, of course, was charged with sexually abusing underage boys. We find it difficult to imagine that a person convicted of such an offense—and consequently ordered not to possess "pornographic material"—could purchase a book containing graphic descriptions of sex between men and boys and think that his parole officer would approve.

Parole Officer Burke apparently understood the word "pornography" to refer only to sexually explicit images, not to text. Burke testified that he had not confiscated *Best Gay Erotica 1996* because it had no pictures in it. When asked whether his definition of pornography would "include written materials that do not contain pictures," Parole Officer Burke replied, "No." Later, he seemed less sure, stating, "If it had just words in it, no pictures, I probably would not arrest him. I would run it past my supervisor and let him make that decision." Burke testified that "pornography" as he understood it would include *Playboy* magazine and a photograph of Michelangelo's *David* (described to him by counsel as "a large sculpture of a nude youth with his genitals exposed and visible").

It may seem odd to define pornography to exclude sexually explicit stories, as Burke apparently did. However, this is the definition of pornography in federal criminal law. *See* 18 U.S.C. § 2256(8).

Under the definitions used by Burke and by federal criminal law, the text in *Scum* would not make it pornographic; nonetheless, the pictures would.

The ALJ's findings suggest that the stories in *Scum*, rather than the pictures, were the primary impetus for the finding that Farrell had violated his parole agreement. But the ALJ's decision certainly took note of the pictures, noting that *Scum* "contains numerous pictures, frontal male nudity, erect penises and males fondling their genitals." It described the stories as the "[m]ost disturbing" aspect of *Scum*, which implies that the pictures were "disturbing" as well. Whatever the ALJ's reasons for finding *Scum* to be "pornographic," it is clear that he did so.

Farrell introduced evidence showing that another ALJ in another parolee's revocation hearing found that certain materials including "pictorials of women in various sex positions" did not constitute pornography because, "[a]s testified to by the BOP staff, pornography is generally considered the extreme of adult literature (child pornography, bestiality, etc)." Although the two ALJs clearly applied different definitions of the term, *Scum* again meets both sets of criteria. *Scum* certainly fits within "the extreme of adult literature." The other ALJ's suggestion that his understanding of "the extreme" included material depicting children further demonstrates that the other ALJ would have considered *Scum* pornographic.

We doubt that many people would agree with the position that pornography includes only sexual materials so "extreme" as to depict children or bestiality. It appears from the other ALJ's opinion that State officials testified to that effect at the hearing, which is troubling given how dramatically that position differs from the

State's position on this appeal that pornography includes virtually any sexual material designed to arouse. But however wide the variation between the understandings of the two ALJs, again we find that both definitions include *Scum.*

Farrell also points us to a New York state court opinion in which the Appellate Division stated that the term "pornography" is interchangeable with the term "obscenity" as understood at common law. *People v. Tucker,* 302 A.D.2d 752, 757 N.Y.S.2d 117, 118 (3d Dep't 2003). For this reason, the court held, a condition of parole that prohibited pornography was not void for vagueness. *Id.* The Third Department's assertion that obscenity and pornography are interchangeable, however, was clearly incorrect as a matter of law. For this proposition the court cited only *People v. Heller,* 33 N.Y.2d 314, 352 N.Y.S.2d 601, 307 N.E.2d 805 (N.Y.1973), which, far from using the terms interchangeably, makes clear that obscenity is defined as pornography that is "hard core," i.e., a subset of the broader category of pornographic materials.[8] *See id.* at 813 (holding that New York law regulating obscene materials was constitutional because it covered only "hard core pornography").

*Tucker* illustrates the confusion that the word "pornography" is capable of generating, but it is not directly relevant to Farrell's as-applied challenge. Farrell argues that *Scum* would not have been prohibited under *Tucker,* and the State does not contest his assertion that *Scum* is not obscene. Whether or not Farrell is correct that *Scum* would have been permissible under *Tucker,* however, *Tucker* could not have created any confusion as to the specific enforcement in Farrell's case because it was decided in 2003, several years after Farrell's parole was revoked.[9] Because the observation in *Tucker* on which Farrell relies did not exist at the time Farrell's condition was enforced, it could not have undermined Farrell's adequate notice that *Scum* was pornographic.

In short, under all definitions relevant to Farrell's case, *Scum* was pornographic. We therefore find that Farrell had adequate notice that *Scum* was prohibited by his parole agreement and that the no-pornography condition was not vague under the first prong of our as-applied vagueness analysis.

### 2. Whether the Special Condition Provided Adequate Standards to Guide the Officers Who Found Farrell in Possession of Scum

The second prong of an as-applied vagueness analysis requires us to ask "whether the law provides explicit standards for those who apply it." *Nadi,* 996 F.2d at 550 (citations, internal alterations and quotation marks omitted); *see Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) ("[T]he more important aspect of the vagueness doctrine is not actual notice, but the other principal

---

8. Indeed, as discussed above, the State would have us hold that the term "pornography" is not vague precisely because it is different from "obscenity."

9. For the same reason, we cannot consider *Tucker* a relevant narrowing construction that might help cure any vagueness in the Special Condition as it was applied to Farrell's possession of *Scum,* even if *Tucker*—rather than *Heller,* which it misinterpreted—provided the binding state interpretation of the term "pornography." *See Coates v. City of Cincinnati,* 402 U.S. 611, 620, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (White, J., dissenting) (noting that in the First Amendment context, a facially vague statute may not be applied even to a defendant whose conduct is clearly covered by the statute "until and unless a satisfactory limiting construction is placed on the statute").

element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement." (citation and internal quotation marks omitted)). Before turning to the facts of Farrell's case, we must clarify the way we analyze as-applied vagueness claims.

When *Nadi* and the predecessor case on which it relied, *United States v. Schneiderman*, 968 F.2d 1564 (2d Cir.1992), applied the second prong of the as-applied vagueness analysis, they held that the statutes at issue generally provided adequate standards governing their enforcement. *See Nadi*, 996 F.2d at 552 (holding that the statute is "sufficiently clear to prevent its arbitrary or discriminatory enforcement"); *Schneiderman*, 968 F.2d at 1568 (holding that the statute "provides sufficient guidance to prohibit its arbitrary or discriminatory application"). On the other hand, in *Perez v. Hoblock*, 368 F.3d 166 (2d Cir. 2004), we analyzed the arbitrary-enforcement prong of an as-applied vagueness challenge in the context of the specific circumstance at issue rather than determining whether, as a general matter, the regulation provided adequate standards. We noted that although a regulation conferred "broad discretion" on enforcing officials, the particular enforcement at issue had been consistent with the "core concerns" underlying the regulation, and so the enforcement did not "represent an abuse of the discretion afforded ... under the regulations." *Id.* at 177. *Perez* did not discuss the differences between its approach and the approach of *Nadi* and *Scheiderman*.

If we were to limit our analysis to the approach of *Nadi* and *Schneiderman* and ask only whether the Special Condition generally provides sufficient guidance for law enforcement, Farrell's as-applied vagueness challenge would present an easy question. Considered without regard to any particular enforcement, the Special Condition clearly provides no "explicit standards for those who apply it," *Nadi*, 996 F.2d at 550 (citation, alteration and quotation marks omitted); indeed, it provides no standards whatsoever. But we do not read *Nadi* and *Schneiderman* to conflict with *Perez* by requiring that we treat the arbitrary-enforcement prongs of as-applied and facial challenges as if they asked the same question in all circumstances.

As a practical matter, a court analyzing an as-applied vagueness challenge may determine that the statute generally provides sufficient guidance to eliminate the threat of arbitrary enforcement without analyzing more specifically whether the particular enforcement was guided by adequate standards. In fact, it is the better (and perhaps more logical) practice to determine first whether the statute provides such general guidance, given that the Supreme Court has indicated that "the more important aspect of the vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855. If a court determines that a statute provides sufficient guidelines to eliminate generally the risk of arbitrary enforcement, that finding concludes the inquiry.

Where a statute provides insufficient general guidance, an as-applied vagueness challenge may nonetheless fail if the statute's meaning has a clear core. *See Smith v. Goguen*, 415 U.S. 566, 573, 577–78, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (noting that "there are statutes that by their terms ... apply without question to certain activities but whose application to other behavior is uncertain," and that such a statute may not be vague as applied to "hard-core violator[s] ... whatever its implications for those engaged in different

conduct"); *see also Brache v. Westchester County,* 658 F.2d 47, 51 (2d Cir.1981) ("[I]f a statute has a core meaning that can reasonably be understood, then it may validly be applied to conduct within the core meaning."). In that case, the inquiry will involve determining whether the conduct at issue falls so squarely in the core of what is prohibited by the law that there is no substantial concern about arbitrary enforcement because no reasonable enforcing officer could doubt the law's application in the circumstances.

Implicit in *Nadi* and *Schneiderman*'s holdings that the statutes at issue provided adequate guidance for law enforcement generally was the conclusion that the statutes had adequately guided the enforcement before the Court. When we concluded in *Nadi* that the statutory provision was "sufficiently clear and narrow in scope to *eliminate* potentially vague and arbitrary enforcement," 996 F.2d at 552 (emphasis added), we necessarily also concluded that the enforcement of the statute against the defendants was not arbitrary. Similarly, in *Scheiderman,* we held that relevant guidelines "*eliminate[d]* potentially vague or arbitrary interpretations." 968 F.2d at 1568 (emphasis added). If there was no *possibility* of arbitrary enforcement, then there could not have been an arbitrary enforcement in the case before the Court. It was thus unnecessary to state explicitly the implied—and required—conclusion that the enforcement at issue in the particular case had been guided by adequate standards.

■ We conclude that there is no conflict between the approach of *Nadi* and *Schneiderman,* which analyzed the sufficiency of the guidelines for enforcement generally, and the approach of *Perez,* which asked whether the particular enforcement before the court was arbitrary. Courts considering as-applied vagueness challenges may determine either (1) that a statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.

■ We find that the Special Condition provided adequate standards for the parole officers to determine whether *Scum* was prohibited, even though its application to other materials would have been uncertain. For the same reasons that Farrell had notice that the condition covered *Scum,* so too did Burke and Freeman. No reasonable parole officer could have doubted that Farrell's possession of *Scum* violated the terms of his parole agreement, and therefore there was no danger that the Special Condition's enforcement would be arbitrary with regard to *Scum.*

Having concluded that Farrell's as-applied challenge is without merit, we now turn to his facial challenge.

### C. *Farrell's Facial Vagueness Challenge*

■ Federal courts as a general rule allow litigants to assert only their own legal rights and interests, and not the legal rights and interests of third parties. This rule against third-party or *jus tertii* standing helps to avoid unnecessary pronouncements and serves to ensure that the issues before the court are "concrete and sharply presented." *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (citations omitted). The rule against *jus tertii* standing is not a jurisdictional command dictated by the case-or-controversy re-

quirement of Article III of the Constitution, but a prudential limitation created by the courts.[10] *See id.*

Because the rule against *jus tertii* standing is not jurisdictional, courts may create exceptions to it. One such exception is the overbreadth doctrine, which we discuss in the next section. In this section, we address Farrell's facial vagueness claim, which is a kind of *jus tertii* challenge. Because we have held that the enforcement of the Special Condition against Farrell did not violate his constitutional rights, Farrell can prevail in his challenge to the regulation only if he can bring a *jus tertii* challenge—in other words, only if we hold that he falls within an exception to the rule against *jus tertii* standing and permit him to argue that other enforcements of the Special Condition would violate the Constitution. Farrell's facial vagueness claim would necessarily rely upon the unconstitutionality of hypothetical applications of the Special Condition, because we have already held

that its application in his case was constitutional.

 Courts have looked with disfavor on facial vagueness challenges to statutes that do not implicate fundamental rights.[11] The Supreme Court has stated that "[a] law that does not reach constitutionally protected conduct ... may ... be challenged on its face as unduly vague, in violation of due process. To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Hoffman Estates,* 455 U.S. at 497, 102 S.Ct. 1186; *see United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (stating in the context of a substantive due process challenge to bail provisions that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid").[12]

**10.** The terms *"jus tertii* standing" and "third-party standing" may be confusing in some circumstances. The plaintiff in an overbreadth or facial challenge objects to hypothetical enforcements of the allegedly vague or overbroad regulation, which can include hypothetical enforcements against the plaintiff himself. In other words, the third parties whose rights are at issue may include the plaintiff.

**11.** In *United States v. Rybicki,* 354 F.3d 124 (2d Cir.2003) (en banc), this Court stated that a statute that does not implicate First Amendment rights should be "assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'" *Id.* at 129 (quoting *Nadi,* 996 F.2d at 550). The Court went on, however, to discuss the standards for facial challenges outside the First Amendment context. *Id.* at 131–32 & n. 3 (noting that the Supreme Court had not spoken clearly as to whether a facial challenge outside the First Amendment context had to show that a statute was impermissibly vague in all applications, or merely that the statute was "per-

meated" with vagueness, and declining to adopt or express a preference for either analysis). The Court then assessed the facial validity of the statute, holding that "the statute is not unconstitutional on its face under either [*United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ] or [*City of Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., plurality opinion) ]." *Id.* at 144. Because the *Rybicki* Court assessed the facial validity of the statute even though no First Amendment rights were implicated, *Rybicki* itself arguably suggests that at least some facial vagueness challenges may be brought outside the First Amendment context, despite its suggestion to the contrary.

**12.** In *Rybicki,* we noted that a plurality of the Supreme Court in *Morales* indicated some doubt as to the viability of the *Hoffman Estates/Salerno* "impermissibly vague in all its applications" test, but declined to decide whether it remains viable. 354 F.3d at 131. In this case we need not decide whether the *Hoffman Estates/Salerno* formulation remains

When a regulation does not threaten the exercise of fundamental rights, "[o]ne whose conduct is clearly proscribed by the [regulation] cannot successfully challenge it for vagueness.'" *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir.2003) (en banc) (quoting *Nadi*, 996 F.2d at 550); *see Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974).

 When fundamental rights are implicated, however, the rules are different.

> Our cases ... recognize a different approach where the statute at issue purports to regulate or proscribe rights of speech or press protected by the First Amendment. Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others. And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute.

*Coates v. City of Cincinnati*, 402 U.S. 611, 619–20, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (internal citations omitted). The general rule disfavoring facial vagueness challenges does not apply in the First Amendment context. *See, e.g., Advance Pharm.*, 391 F.3d at 396 (characterizing *City of Chicago v. Morales*, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., plurality opinion) as "noting [the] propriety of facial vagueness review when [the] statute infringes on constitutionally protected rights" and *Parker*, 417 U.S. at 759, 94 S.Ct. 2547, as "noting [the] exception in [the] First Amendment context to [the] traditional rule against facial attacks.").

 Facial vagueness challenges may go forward only if the challenged regulation "reaches a substantial amount of constitutionally protected conduct." *Kolender*, 461 U.S. at 358 n. 8, 103 S.Ct. 1855 (internal citation and quotation marks omitted). *See also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (noting that a facial challenge for vagueness may go forward where "the statute's deterrent effect

---

viable, because, for the reasons discussed *infra*, we hold that we may not reach the merits of Farrell's facial challenge.

It is also not clear whether the "impermissibly vague in all its applications" standard, if indeed it is the governing standard, applies where fundamental rights other than First Amendment rights are implicated. In *Morales*, "the Court struck down an anti-loitering statute as facially unconstitutional without first considering whether the statute was unconstitutionally vague as applied to the facts of the case or whether any set of circumstances existed in which the statute would be valid." *Rybicki*, 354 F.3d at 131. *Morales* was a plurality opinion, but a majority of the Court concurred in the result, and no concurring justice suggested that First Amendment rights were implicated. *See* 527 U.S. at 64–70, 119 S.Ct. 1849 (concurring opinions of O'Connor, J., and Kennedy, J.); *id.* at 70–73, 119 S.Ct. 1849 (concurring opinion of Breyer,

J.) (noting that "this case is unlike those First Amendment 'overbreadth' cases in which this Court has permitted a facial challenge").

Thus, it appears that the Supreme Court might decline to apply the "impermissibly vague in all applications" standard for facial challenges wherever fundamental rights are at stake, not merely in those cases where First Amendment rights are at stake. *Cf. Advance Pharm.*, 391 F.3d at 396 ("The vagueness test articulated in *Grayned* is not applied mechanically. Its sternest application occurs when a law 'threatens to inhibit the exercise of *constitutionally protected rights*,' particularly those protected by the First Amendment.") (quoting *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. 1186 (emphasis added)). Because Farrell does not argue that the Special Condition implicates fundamental rights other than those protected by the First Amendment, however, we need not resolve this question here.

on legitimate expression" is "both real and substantial"). Therefore, to determine whether Farrell may bring his facial vagueness challenge, we must first determine whether the Special Condition will have a substantial chilling effect on protected conduct. *See Loy,* 237 F.3d at 259 ("A defendant whose conduct is at the 'core' of the activities clearly covered by the statute's terms may only raise a vagueness defense if the statute is one that is likely to chill the exercise of constitutionally protected conduct.").

Several factors lead us to conclude that this case presents no danger of chilling sufficient to allow a facial challenge to go forward. First, we note that the First Amendment rights of parolees are circumscribed. Pornographic materials—at least those that are not obscene—receive full First Amendment protection when in the possession of ordinary adults, but may be regulated in the hands of parolees to a much greater extent. *See Birzon,* 469 F.2d at 1243 (noting that "the Government can infringe the first amendment rights" of prisoners and parolees "so long as the restrictions are reasonably and necessarily related to the advancement of some justifiable purpose of imprisonment").

Because Farrell was a convicted sex offender, most regulations of his possession of sexual material would be "reasonably and necessarily related to the Government's legitimate interests in the parolee's activities" and thus would not violate the First Amendment. *Id.* We do not suggest that all material that might be called "pornographic," given the term's inherent vagueness, could be prohibited without violating the First Amendment. In determining whether a regulation reaches substantial protected conduct, we must consider everything that falls within the ambiguous scope of the phrase "pornographic material," *see Hoffman Estates,* 455 U.S. at 494 n. 6, 102 S.Ct. 1186 ("In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment."), which is very broad indeed.[13] Even if some materials included in the ambiguous scope of the Special Condition would be protected, however, a great deal of "pornographic material" can constitutionally be prohibited in the hands of a convicted pedophile. Thus, a great deal of the conduct regulated by the Special Condition was not protected.

Furthermore, the Special Condition applied only to Farrell. *See United States v. Albanese,* 554 F.2d 543, 547 (2d Cir.1977) ("Since, unlike a statute, the probation condition at issue here can affect only appellant, and since his conduct could be legitimately proscribed, it would be inappropriate for us to consider whether the condition might be overbroad on its face."). Thus, Farrell was the only person whose conduct might have been chilled. Of course, the First Amendment is implicated if even one person's constitutionally protected conduct is chilled; any injury to First Amendment rights is a matter of profound concern to the courts. But Farrell's First Amendment rights were limited because of his status as a paroled sex offender, which made it less likely that any protected conduct was chilled.

In addition, the procedural posture of this case makes it possible for us to say with confidence that the Special Condition's vagueness resulted in no cognizable

13. It is conceivable, for example, that Farrell could have brought a successful First Amendment challenge had he been arrested for possession of a photograph of Michelangelo's *David* or a lingerie catalog—materials that fall within the broad definitions of "pornographic" advanced by Parole Officer Burke in his testimony and the State on this appeal, respectively.

chilling effect. Because the Special Condition is no longer in effect, and because the sole person it affected is before this Court, we are in an ideal position to assess whether it actually had a chilling effect. Farrell has made no allegation that he refrained from any protected conduct or altered his behavior in any way as a result of the Special Condition's vagueness. Farrell could have argued that the Special Condition's vagueness prevented him from engaging in protected conduct, but he has not done so. Farrell was not required to do so; a plaintiff seeking to bring a vagueness challenge need show only the risk of chilling, not an actual chilling effect. But it is appropriate to note that Farrell does not claim any such effect actually existed, and our confidence that Farrell avoided no constitutionally protected material supports our conclusion that a facial challenge is inappropriate here. *Cf. Loy,* 237 F.3d at 265 (noting in pre-enforcement challenge that "to the extent that Loy is likely to avoid materials that are *not* 'directly related' to the goals of rehabilitation and deterrence, the condition threatens to chill protected conduct") (emphasis in original).

We hold that Farrell has failed to show that the Special Condition reached a substantial amount of protected conduct because (1) Farrell's First Amendment rights as a paroled sex offender were circumscribed, (2) Farrell was the only person affected by the Special Condition, and (3) Farrell offered no evidence that the Special Condition chilled any protected conduct while it was in effect. Because Farrell has not shown a substantial threat to constitutionally protected conduct, the fact that his possession of *Scum* was "clearly proscribed" by the Special Condition means that he "cannot successfully challenge it for [facial] vagueness." *Rybicki,* 354 F.3d at 129. Accordingly, we do not assess the merits of his facial challenge.

It is important to note that, in holding that Farrell's facial vagueness challenge may not go forward, we in no way disagree with prior statements by this Court and others to the effect that conditions of parole or supervised release banning the possession of "pornography," without further definition, are facially vague. *See Simmons,* 343 F.3d at 82 (noting that the term "pornography" is "inherently vague" when not associated with a specific definition); *Loy,* 237 F.3d 251 at 265 (holding a no-pornography condition unconstitutionally vague); *Guagliardo,* 278 F.3d at 872 (same). Although we are precluded from reaching the merits of Farrell's facial challenge, we cannot ignore the State's failure to provide meaningful notice of the scope of the Special Condition's prohibition or meaningful limits on an enforcing officer's discretion. We hope that greater efforts will be made in the future to define adequately the terms of parole conditions dealing with pornographic materials.

### D. First Amendment Overbreadth

 Farrell also claims that the pornography condition was unconstitutionally overbroad. Overbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing. *See Broadrick v. Okla.,* 413 U.S. 601–12, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them. *See id.* at 612, 93 S.Ct. 2908. All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court.

 Overbreadth and vagueness are different doctrines. "A clear and pre-

cise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). As discussed above, Farrell's facial vagueness challenge is precluded in part because he could not show that the Special Condition was vague as applied to his conduct. This will not be a barrier to his overbreadth challenges, because overbreadth challenges are based upon the hypothetical application of the statute to third parties. A plaintiff claiming overbreadth need not show that the challenged regulation injured his or her First Amendment interests in any way in order to bring the overbreadth challenge.

▪ We allow a party to bring an overbreadth challenge where that party "satisfies the [Article III] requirement of 'injury-in-fact,' and [where] it can be expected satisfactorily to frame the issues in the case." *Munson*, 467 U.S. at 958, 104 S.Ct. 2839. In this case, Farrell's parole revocation was clearly an injury-in-fact, and there is no question that he is thus well-suited to frame satisfactorily the issues in this case.

▪ Although there is no bar to Farrell bringing his overbreadth challenge, it fails on the merits. In order to prevail on an overbreadth challenge, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615, 93 S.Ct. 2908. As with facial vagueness challenges, we must consider not only conduct clearly

prohibited by the regulation but also conduct that arguably falls within its ambiguous sweep. The purpose of an overbreadth challenge is to prevent the chilling of constitutionally protected conduct, as prudent citizens will avoid behavior that *may* fall within the scope of a prohibition, even if they are not entirely sure whether it does.

Thus, the analysis of the merits of an overbreadth challenge is essentially the same as the analysis discussed above in the facial vagueness context. Because Farrell's First Amendment rights as a paroled sex offender were circumscribed, and because Farrell was the only person affected by the Special Condition, we cannot say that the Special Condition's overbreadth was both real and substantial in relation to its plainly legitimate sweep. Accordingly, we reject Farrell's overbreadth challenge.[14]

## CONCLUSION

For the reasons stated above, the judgment of the district court granting summary judgment to the defendants is AF-FIRMED.

---

**14.** Because we have found no cognizable violation of Farrell's rights in this case, we need not reach the question of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("[T]he requisites of a qualified immunity defense must be considered in proper sequence.... A court required to rule upon the qualified immunity issue must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.").