*United States v. Thompson*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

———————

August Term, 2017

(Argued: August 28, 2017    Decided: July 13, 2018)

Docket No. 16-2986

———————

UNITED STATES OF AMERICA,

*Appellee*,

–v.–

ALVAUN THOMPSON, *AKA LP, AKA Legit Pimp, AKA AT*,

*Defendant-Appellant.*

———————

B e f o r e :

PARKER, LYNCH, and CARNEY, *Circuit Judges*.

———————

Alvaun Thompson appeals from a judgment entered in the Eastern District of New York (Glasser, *J.*), challenging his convictions under 18 U.S.C. § 1591 for prostituting two minors, and under 18 U.S.C. § 2251 for employing a minor in the creation of a sexually explicit video. He argues that section 1591 is unconstitutionally overbroad in that its prohibition on "harbor[ing], transport[ing], . . . or maintain[ing]" minors who are engaging in commercial sex activities chills organizations' and families' exercise of First Amendment associational rights. He further contends that the indictment in this case was deficient in that it failed to allege that he knew one of his

minor victims was younger than 14 years of age, a factor that he asserts is an essential *mens rea* element of section 1591(a) and (b)(1). Finally, with regard to his conviction under section 2251 for production of a sexually explicit video, he challenges the propriety of venue in the Eastern District of New York. Having concluded that Thompson's arguments are without merit, we reject these challenges.

**AFFIRMED**.

MATTHEW B. LARSEN, Assistant Federal Defender, Federal Defenders of New York Appeals Bureau, New York, NY, *for Defendant-Appellant*.

MATTHEW JACOBS, Assistant United States Attorney (David C. James, Jennifer Sasso, Assistant United States Attorneys, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee*.

SUSAN L. CARNEY, *Circuit Judge*:

Following a jury trial, Alvaun Thompson was convicted in 2015 on nine counts related to his prostitution of two minor victims in New York City in 2013 and 2014. On appeal from the judgment entered in the Eastern District of New York (Glasser, *J.*), Thompson challenges his convictions for violating 18 U.S.C. § 1591 ("Sex trafficking of children or by force, fraud, or coercion") and 18 U.S.C. § 2251 ("Sexual exploitation of children"). He argues that section 1591 is unconstitutionally overbroad; that his indictment was deficient as to the section 1591 count, in that it failed to allege that he knew one of his minor victims was younger than 14 years of age; and that, as to his conviction under section 2251, the government failed to prove that venue was proper in the Eastern District of New York. For the reasons set forth below, we reject these challenges.

2

In relevant part, section 1591 proscribes "harbor[ing] . . . or maintain[ing]" a person under the age of 18, knowing that the person "will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a). Thompson premises his constitutional overbreadth challenge to the statute principally on the theory that charities and religious organizations, as well as family members of minor prostitutes, could be prosecuted under section 1591 for providing food, shelter, and other support to young persons engaged in prostitution. Such prosecutions, he argues, would violate those entities' or individuals' First Amendment expressive associational and intimate associational rights. We decide that, even assuming that the statute could reasonably be construed to permit such prosecutions as he hypothesizes, Thompson has demonstrated neither that section 1591 substantially burdens First Amendment rights in an "absolute sense," *United States v. Williams*, 553 U.S. 285, 292 (2008), nor that it substantially burdens First Amendment rights relative to its broad legitimate sweep.

Thompson also fails to persuade us that, because the indictment did not allege that he knew that one minor victim was under 14 years of age, his conviction under subsections (a) and (b)(1) of section 1591 must be reversed. Rather, we conclude that the statutory language requires that the defendant know or recklessly disregard the fact that a minor was younger than 18 years old. It does not mandate, to support the increased punishment in subsection (b), that the government prove that a defendant knew or recklessly disregarded that a minor was under the age of fourteen.

Finally, Thompson's venue challenge to his conviction under section 2251 after a jury trial in the Eastern District of New York is also unavailing. As relevant here, section 2251 criminalizes the production of child pornography. Although Thompson physically produced the pornographic video at issue in the Southern District of New York, the government presented ample evidence that elements of Thompson's criminal conduct—his persuasion, inducement, enticement, or coercion of the minor victim,

3

leading her to engage in the sex acts depicted in the video—occurred in the Eastern District. Based on this evidence, the jury was entitled to find that venue for prosecution lay in the Eastern District of New York.

We therefore **AFFIRM** the judgment of the District Court.

## BACKGROUND

Because Thompson appeals from a judgment of conviction entered after a jury trial, we "draw the facts from the evidence presented at trial, viewed in the light most favorable to the government." *United States v. Allen*, 864 F.3d 63, 69 n.8 (2d Cir. 2017) (internal quotation marks omitted).

Thompson began his relationship with the two minor female victims of concern here—identified as M1 and M2—in early 2013, when he was twenty-six years old and they were thirteen and fifteen years old, respectively. Thompson soon began directing the minors to engage in prostitution: he instructed them to offer their prostitution services on the "Penn Track"—a notorious area in Brooklyn's East New York neighborhood—and he advertised their services as prostitutes on the now-defunct website www.backpage.com ("Backpage"). Thompson's Backpage postings displayed the minors semi-nude and in sexually suggestive poses, and offered to sell the prostitution services of each. On several occasions from March through November 2013, the girls were each arrested on the Penn Track for prostitution.

From those early 2013 encounters through the 2015 arrest of Thompson that led to the convictions he now appeals, Thompson employed a variety of methods to gain and maintain control over the girls. He shared an address in Brooklyn with them for at least some of the time during which he sold their prostitution services, and he exercised stringent control over the girls' finances. He professed affection for them and, at the

4

same time, threatened them with violence and cursed at them.[1] Thompson personally tattooed his alias—"LP"—under M2's eye, and M1 had his first name tattooed on her breast. The record contains numerous transcripts and recordings of conversations between Thompson and each of the teenagers that depict this controlling and manipulative relationship. These interactions reflect the girls' conviction that they were engaging in prostitution out of a devotion to him.

The control that Thompson exercised over the girls was powerful. In September 2013, Thompson was arrested for a robbery that had occurred a month earlier and was incarcerated on Rikers Island from then until July 2014, when, after being convicted of petit larceny and sentenced to time served, he was released. Nonetheless, from his first day on Rikers Island until the end of his confinement there eleven months later, he continued to manage and prostitute the girls, directing their activities through phone calls to his confederates and to the girls themselves. Even from the remove of that jail, he was able to dictate where the girls would live, what rooms they would rent for their prostitution activities, and what prostitution services they would offer to customers. He also continued to collect his portion of the proceeds of their prostitution, successfully demanding that the girls place his claimed share in his commissary account at the jail. His threats, harassment, and emotional abuse of the girls also persisted during this period.[2]

---

[1] *Compare* Government Trial Ex. 2L ("[Y]ou my mirror image. You the reflection of me because you know how I think."), *with* Government Trial Ex. 2H ("[T]ell [M1] to get her f***ing a** back on the f***ing phone right now or it's a bigger problem than she f***ing got right now.").

[2] On June 3, 2014, for example, as a recording played at trial showed, Thompson called M1 and rebuked her for her interest in a boyfriend other than himself. He warned, "At the end of the day, like you dead ass is mine," adding that if she "wanna have sex or some s**t, go for it, but do it for f***ing dollars, don't do it for f***ing nothing." Government Trial Ex. 2V. He continued,

In July 2014, soon after his release from jail, Thompson rejoined M1 and M2. Over the next six months, he posted dozens of advertisements for their prostitution services on Backpage. Thompson also transported M1 and M2 to Maryland and Pennsylvania, advertising their services in those states. During this time, he sent the girls semi-nude photos of each other and of other prostitutes who were working for him.

In December 2014, following a vice-unit investigation that lasted eighteen months, New York City police officers arrested Thompson in a Bronx motel, where they found him with M1 and M2. Although, notwithstanding their lengthy investigation, they soon released Thompson, the officers seized his mobile phone in connection with the arrest. On that phone, they found a video made earlier in December and later ascertained to have been made in the Bronx of M1 performing oral sex on Thompson. In January 2015, the FBI arrested Thompson on the federal charges that led to the convictions he now contests.

After a four-day trial in November 2015, a jury found Thompson guilty on nine counts. Eight counts were related to his prostitution of the girls: three counts of sex trafficking of minors in violation of 18 U.S.C. § 1591(a) and (b); one count of promoting prostitution in violation of 18 U.S.C. § 1952(a); two counts of illicitly transporting minors in violation of 18 U.S.C. § 2423(a); and two counts of interstate prostitution in violation of 18 U.S.C. § 2422(a). The ninth count charged sexual exploitation of a child through the production of child pornography in violation of 18 U.S.C. § 2251(a). That charge was based on the video found on Thompson's phone at the time of his arrest in December 2014.

---

"[I]f it ain't about money, it's cheating on me," but then added that he loved her. *Id.* The girl replied that she loved him, too.

In preparation for sentencing and in response to the presentence report, the District Court conducted a hearing under *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979), and found by a preponderance of the evidence that Thompson was responsible for a September 2013 murder related to a dispute with a rival over control of M2. Based on this finding and the nine counts of conviction, the District Court calculated the applicable Guidelines range to be life imprisonment. The court sentenced Thompson, then age 29, principally to thirty years' imprisonment.

Thompson timely appealed.

## DISCUSSION

As noted above, Thompson raises three challenges to his convictions. He argues, first, that section 1591 (outlawing certain acts in connection with sex trafficking[3]) is unconstitutionally overbroad; second, that section 1591(a) and (b)(1) must be construed to contain an additional *mens rea* element (knowledge not only that the victim was a minor, but also that he or she was under fourteen years of age) and the government erred in not so charging; and third, that the government failed to prove, for the video-related charge under section 2251(a), that venue for his prosecution properly lay in the Eastern District of New York. We address each argument in turn.[4]

---

[3] In addition to prohibiting sex trafficking of individuals under the age of 18, section 1591 criminalizes sex trafficking of *any* person by "means of force, threats of force, fraud, coercion . . . , or any combination of such means." 18 U.S.C. § 1591(a). The government charged Thompson under both theories of liability, but the jury found in a special verdict that Thompson knew both girls were under age 18, rendering the "force, fraud, [or] coercion" prong irrelevant. Accordingly, for purposes of this opinion only, we refer to section 1591 as the "minor victim" or "child" trafficking provision.

[4] In his opening brief on appeal, Thompson also argued that his concurrent convictions under each of 18 U.S.C. §§ 2422(a) and 2423(a) violate the Double Jeopardy Clause. He has since abandoned that argument. Appellant's Reply Br. at 1.

## I.     Overbreadth challenge

Thompson first contends that section 1591 violates the First Amendment because it is facially overbroad, therefore requiring reversal of his convictions under that statute. We review *de novo* a district court's analysis of an overbreadth challenge. *United States v. Farhane*, 634 F.3d 127, 134 (2d Cir. 2011).

When Thompson was convicted of violating section 1591, the statute provided in relevant part:

> Whoever knowingly—
>
> > (1) . . . recruits, entices, harbors, transports, provides, obtains, or *maintains by any means* a person; or
> >
> > (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or in reckless disregard of the fact, . . . that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished . . . .

18 U.S.C. § 1591(a) (2014) (emphasis added).[5]

Two different types of improper prosecution could occur under this statute, according to Thompson, and each of these would violate the relevant defendant's First Amendment associational rights. First, he urges that under a plain reading of this

---

[5] In May 2015, Congress amended section 1591 to criminalize three additional acts in furtherance of the other enumerated elements of the crime: "advertis[ing]," "patroniz[ing]," and "solicit[ing]." *See* Justice for Victims of Trafficking Act of 2015, Pub L. No. 114-22, §§ 108, 118, 129 Stat. 227, 238–39, 247. Because Thompson was charged with conduct occurring between early 2013 and early 2015, we refer only to the earlier version of the statute, in effect from December 2008 until May 2015.

statute, and particularly in view of its use of the phrase "maintains by any means," prosecutors could charge charities and religious organizations for providing assistance to child prostitutes. Punishing these entities and those who work for them for providing such assistance, Thompson suggests, interferes unlawfully with the entities' expressive associational rights. Second, Thompson argues that family members of minors engaging in commercial sex are vulnerable to prosecution under the statute if they provide care for those minors, and that the exposure intrudes unlawfully on the family members' intimate associational rights. According to Thompson, these First Amendment intrusions are so substantial that the minor victim trafficking provision must be struck down as unconstitutionally overbroad.

The District Court rejected Thompson's overbreadth challenges, concluding that the intrusive prosecutions posited by Thompson were "absurd[ ]" and "unrealistic" in light of the statute's text and legislative history. *United States v. Thompson*, 141 F. Supp. 3d 188, 199–200 (E.D.N.Y. 2015) (internal quotation marks omitted). After concluding that Thompson's reading of the statute was "not persuasive" and "incompatible with its purpose," *id.* at 199, the court did not go on to compare the statute's legitimate sweep with the substantiality of any burden it imposes on constitutional rights, as later steps in the overbreadth analysis require. Because of the broad language of the statute and the complexity of the social problem that it addresses, we believe that Thompson's arguments merit more extensive analysis before they can fairly be adjudicated.[6]

---

[6] In an effort to increase the number of constitutionally questionable applications to which section 1591 could be put, Thompson gives the statute an extremely broad reading, under which just about any helping hand extended to someone a person knows is an underage prostitute would violate the statute, regardless of the actor's purpose. We share the District Court's doubts about that construction, particularly in light of the legislative history, which amply demonstrates that the law was targeted at human traffickers, not organizations and families

9

Premised on a concern that "enforcement of an overbroad law may deter or 'chill' constitutionally protected [First Amendment activity]," *Virginia v. Hicks*, 539 U.S. 113, 119 (2003), overbreadth challenges present "an exception to the general rule against third-party standing," *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). Thus, a defendant making such a challenge "claims that[,] although a statute did not violate his or her [own] First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them." *Farrell*, 449 F.3d at 498. All overbreadth challenges are therefore facial challenges. *Id.* Because "invalidat[ing] *all* enforcement of a challenged law . . . is 'strong medicine,'" *Farhane*, 634 F.3d at 136–37 (emphasis in original) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)), the challenging party "must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally," *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988). Moreover, to be struck as overbroad, the statute must be overbroad "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292.

Notably, overbreadth doctrine has developed primarily in the context of laws that include within their ambit a substantial amount of *speech* protected by the First Amendment. *See, e.g.*, *Williams*, 553 U.S. at 292 ("According to our First Amendment

---

working to wean minors away from such traffickers. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466, *codified at* 22 U.S.C. § 7101(a) ("The purpose[ ] of this division [is] . . . to ensure just and effective punishment of traffickers, and to protect their victims."); *id.* § 102(b)(5), 114 Stat. at 1466 ("Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable."). Nevertheless, for purposes of the constitutional analysis that follows, we assume without deciding that Thompson's reading of the statute is correct.

overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected *speech*." (emphasis added)); *Hicks*, 539 U.S. at 124 ("Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating).") Less common are cases in which a litigant argues that a statute is unconstitutionally overbroad because it interferes with *associational* activity, expressive or intimate, that is protected by the First Amendment. Cases falling into this latter category—like this one—do, however, arise. *See, e.g.*, *N.Y. State Club Ass'n*, 487 U.S. at 14–15; *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995–98 (2d Cir. 1997); *see also URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 11–13 (1st Cir. 2011).

As set forth below, we ultimately agree with the District Court, and the other courts within our Circuit to consider the question,[7] that the specter of unconstitutionality that Thompson sketches is largely illusory. As applied to charitable and religious organizations, we conclude that section 1591 applies to these organizations' non-expressive *conduct* and thus does not in the end implicate their First Amendment right to expressive association. And even assuming that section 1591 could be interpreted and enforced as broadly as Thompson suggests as to families, he has failed to demonstrate that any burden on family members' intimate associational rights is substantial either in an absolute sense or relative to the plainly legitimate sweep of section 1591. We therefore reject Thompson's overbreadth challenge to section 1591.

---

[7] *See United States v. Estrada-Tepal*, 57 F. Supp. 3d 164, 170–72 (E.D.N.Y. 2014) (rejecting an overbreadth challenge to section 1591 on ground that "hypothetical[ ]" infringing applications of the statute are insubstantial in comparison to its lawful breadth); *United States v. Richards*, No. 13-CR-818 (LAK), 2014 WL 3765712, at *3–4 (S.D.N.Y. July 29, 2014) (same).

## A.    Expressive associational rights: charitable and religious organizations

First, in our view, the expressive associational rights of the types of organizations to which Thompson refers are simply not implicated by the statute.[8]

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). This derivative right is the right to engage in expressive association. *See Sanitation & Recycling Indus., Inc.*, 107 F.3d at 996. When, on the other hand, an individual engages in conduct that does not manifest an "intent to convey a particularized message," the First Amendment does not come "into play." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (internal quotation marks omitted). Because "[i]t is possible to find some kernel of expression in almost every

[8] In *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), the Supreme Court distinguished between intimate associational rights and expressive associational rights as follows:

> Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of *personal liberty*. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving *other individual liberties*.

468 U.S. at 617–18 (emphasis added); *see Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995–96 (2d Cir. 1997) (describing Constitution's protection of "two distinct types of association, 'intimate association' and 'expressive association'").

activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall"—the fact that an activity contains a "kernel of expression" does not compel the conclusion that the activity qualifies as a form of "expressive association" and is shielded by the First Amendment. *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

Thompson argues that limiting the activities (such as providing support services to young trafficking victims) in which charitable and religious groups may engage "is plainly a substantial 'intrusion into the internal structure or affairs of [the] association.'" Appellant's Br. at 11 (alteration in original) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000)). In support of his position that section 1591 could be used to infringe on these organizations' associational rights, Thompson places great weight on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), in which the Supreme Court found to be overbroad a law requiring a nonprofit organization, the Boy Scouts, to admit as a member someone whose membership, in the organization's view, undermined its core tenets. *Id.* at 656–61.

But *Dale* is inapt. Even under Thompson's broad reading of the statute, section 1591(a) does not require any organization to admit as members individuals like the minor victims (the issue in *Dale*), prohibit it from doing so, or prevent such a group from advocating on behalf of minor victims. *Cf. Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 568 (2005) (describing expressive associational rights as "prohibit[ing] the government from coercively associating individuals or groups with unwanted messages" (citing *Dale*, 530 U.S. at 653, and *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 576–77 (1995))).

To the extent that the minor victim trafficking provision restricts the activities of charitable or religious groups, it places limits on the non-expressive *conduct* in which

they may engage, rather than on their right to associate for the purpose of expressing their views. *See* Appellant's Br. at 13 (expressing concern that statute makes criminals of documentary "filmmakers who buy meals for the minors they follow" and "journalists and social scientists who compensate trafficked minors for interviews"). Whether section 1591 restricts the universe of activities these organizations may pursue—and whether section 1591 might incidentally curb their ability to help minors involved in the sex trade to find food and shelter—they have no *First Amendment* right to engage in much of the conduct Thompson references.[9] *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986) (identifying only those laws targeting "conduct with a significant expressive element" and "statute[s] based on a non-expressive activity that ha[ve] the inevitable effect of singling out those engaged in expressive activity" as triggering "'least restrictive means' scrutiny"); *Young v. New York City Transit Auth.*, 903 F.2d 146, 154 (2d Cir. 1990) ("Speech simply is not inherent to the act; it is not the essence of the conduct.").

Thompson paints with far too broad a brush when he implies that an organization's activities of this sort would be protected by the First Amendment simply

---

[9] Unlike most of the prosecutions Thompson envisions—which, as discussed above, penalize non-expressive conduct that is outside the scope of the First Amendment—he also submits that section 1591 might be invoked to prosecute "therapist[s] who counsel[ ] a trafficked minor or coerced person" and "lawyer[s] who advocate[ ] in court to get the person out of jail or into child-protective custody." Appellant's Reply Br. at 6. According to Thompson, such prosecutions violate the First Amendment because they "criminalize[ ] speech." *Id.* We doubt very much that section 1591's proscription extends as far as Thompson posits, but even if it did, and even if the government were to prosecute therapists or lawyers for the conduct Thompson identifies, section 1591 would be subject to a well-founded challenge to the statute then as applied. *See infra* Discussion Part I.B. Thompson has fallen far short of demonstrating that the volume of these potential prosecutions is substantial relative to the statute's plainly legitimate sweep so as to justify striking it down in its entirety.

because the organization earnestly believes those activities are important.[10] Insofar as the statute, read literally, might be cited as prohibiting an organization from providing certain types of direct support services to minor prostitutes, it does not present a First Amendment problem. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 40 (2010) (rejecting First Amendment challenge to statute "prohibit[ing] certain forms of speech that constitute material support" to terrorist groups); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) (concluding that federal funding condition that "demand[ed] that funding recipients adopt—as their own—the Government's view on an issue of public concern" violated First Amendment).

Thompson also mentions that some of the organizations he identifies are religious and thus, he briefly suggests, their activities are entitled to "special solicitude." *See* Appellant's Br. at 12 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 189 (2012)); Appellant's Reply Br. at 10–11 (same). Thompson overstates the significance of *Hosanna-Tabor*, the single case he cites in support of this proposition. In *Hosanna-Tabor*, the Supreme Court held only that the "ministerial exception" doctrine "protects religious employers from employment discrimination lawsuits brought by their ministers." *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 418 (2d Cir. 2018). The Court in *Hosanna-Tabor* expressly distinguished "government regulation of only outward physical acts"—which it found to be permissible—from impermissible

---

[10] For example, Thompson's conception of the First Amendment would shield from prosecution marijuana advocacy groups that distribute that substance to people with a perceived medical need for it, so long as the groups strongly believed that marijuana should be fully legal. This broad interpretation of associational rights derives no support from Supreme Court precedent. *Cf. Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881–82 (1990) (rejecting respondents' invitation "to hold . . . that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from government regulation").

15

"government interference with an internal church decision that affects the faith and mission of the church itself." 565 U.S. at 190 (distinguishing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990)). We have little difficulty in concluding that the proscriptions imposed by section 1591 fall within the former, permissible category.[11]

In sum, therefore, section 1591 does not impose a substantial burden on the expressive associational rights of charitable and religious organizations because it affects, if anything, those organizations' non-expressive conduct only.

## B. Intimate associational rights: minor victims' family members

Second, Thompson fails to persuade us that the statute substantially infringes families' intimate associational rights.[12] In *Roberts v. United States Jaycees*, the Supreme Court recognized a right to intimate association that allows individuals to "enter into and maintain certain intimate human relationships [without] undue intrusion by the State." 468 U.S. at 617–18. The Court identified "[t]he personal affiliations that exemplify these considerations" as including "those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Id.* at 619–20 (citations omitted). The *Jaycees* decision

---

[11] Regardless, Thompson has hardly demonstrated that the burden that the minor victim trafficking provision imposes on religious organizations' activity is substantial "in an absolute sense" or "relative to the statute's plainly legitimate sweep." *See United States v. Williams*, 553 U.S. 285, 292 (2008).

[12] Our Court has not determined whether the right to intimate association finds its roots in the First Amendment or in the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 57 n.17 (2d Cir. 2014) (recognizing lack of clarity). We need not make that determination here, however, because Thompson's overbreadth challenge fails even assuming that "overbreadth attacks apply to alleged infringements of the right to intimate association as they do to First Amendment rights." *See Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997).

likely permits (or even compels) recognition, we think, of a right to intimate association between, for example, a parent and his or her minor child who is engaged in prostitution. *See id.* This is the right upon which the minor victim trafficking provision unconstitutionally intrudes, according to Thompson.

Ordinarily, the first step in an overbreadth analysis is to "construe the challenged statute." *Williams*, 553 U.S. at 293; *see also id.* ("[I]t is impossible to determine whether a statute reaches too far without first knowing what the statute covers."). Although the statutory language at issue here is decidedly broad, we share the District Court's skepticism about the interpretations Thompson offers to illustrate his argument.[13] We need not determine, however, whether the minor victim trafficking provision can reasonably be read to permit the prosecutions Thompson envisions, because, even assuming that it may, Thompson has failed to demonstrate that individuals' intimate associational rights are substantially burdened in relation to the plainly legitimate sweep of the statute. *See Farhane*, 634 F.3d at 136 (noting that Supreme Court "rigorously enforces the burden on the challenging party").

The statute's legitimate sweep is apparent: it allows conviction of individuals like Thompson, who has forced minors into prostitution and maintained them through varied means. In enacting the Victims of Trafficking and Violence Protection Act of 2000, in which section 1591(a) first appeared, Congress sought to allow prosecution of those responsible for trafficking in the United States and made specific findings about the extent of this scourge at the time of the bill's enactment. *See* Pub L. No. 106-386, § 102(b)(1), 114 Stat. 1464, 1466, *codified at* 22 U.S.C. § 7101(b)(1) (finding at least "700,000 persons annually, primarily women and children," trafficked worldwide, and "[a]pproximately 50,000 women and children . . . trafficked into the United States each

---

[13] *See supra* n.6.

17

year"). Thompson offers no evidence suggesting that child prostitution, or sex trafficking generally, has diminished in the past eighteen years, and the opposite seems more likely, *see, e.g.*, U.S. Dep't of Justice, *The National Strategy for Child Exploitation Prevention and Interdiction: A Report to Congress* 78 (Apr. 2016), https://www.justice.gov/psc/file/842411/download ("While the total number of children exploited through sex trafficking in the United States is immeasurable, the number of child victims reported missing, identified, and recovered in on-going sex trafficking investigations continues to increase.").[14]

Absent from the record, on the other hand, is evidence showing circumstances that would justify a substantial number of prosecutions under Thompson's proposed reading of the statute that might infringe the rights to intimate association of minor prostitutes' family members. As Congress observed in connection with the Act's passage, many minors engaging in prostitution have been purposefully removed from, or themselves have taken leave of, the support structure of their families, making the unlawful provision of sustenance by their families, while possible, unlikely in fact. *See* Pub. L. No. 106-386, § 102(b)(5), 114 Stat. at 1466 ("Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable.").

---

[14] Thompson cites to statistics from the Sentencing Commission regarding the relatively low number of convictions obtained under section 1591 in the government's fiscal year 2015. *See* Appellant's Reply Br. at 14. These data do not reveal how many trafficked minors' family members *could be* or *actually were* prosecuted. Nor does the low number of convictions suggest, as Thompson posits without support, that the number of sex "traffickers [is] few . . . compared to the scores of law-abiding people who 'maintain' the trafficked in the course of exercising First Amendment rights," *id.*: unfortunately, many people who engage in sex trafficking go unpunished.

Further, even were we to assume that many minors engaging in prostitution have available to them supportive family members with whom they often interact, the record provides no basis to expect that these family members would have the *mens rea* required to support conviction under Thompson's construction of section 1591: for the government to obtain a conviction, the family member would need to be providing support "knowing, or in reckless disregard of the fact, that" the minor will, at a later time, "be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a) (2014). The record Thompson has made on this point is hardly well developed or compelling.[15]

Thompson has thus failed to "demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally." *N.Y. State Club Ass'n, Inc.*, 487 U.S. at 14. Although declaring the entire statute unconstitutionally overbroad would be improper in this case and on this record, we note again that if an arguably unlawful prosecution, in one of the unlikely scenarios Thompson identifies, were ever pursued, it "could of course be the subject of an as-applied challenge." *Williams*, 553 U.S. at 302. For these reasons, we reject Thompson's overbreadth challenge to the minor victim trafficking provision.

---

[15] In support of his argument that section 1591 imposes a substantial burden on intimate associational rights, Thompson cites one academic article that reported "25% (224) of [child prostitution] cases [in a sample of 901] occurred while the child was living at home." Appellant's Br. at 19 (quoting Rowena Fong & Jodi Berger Cardoso, *Child Human Trafficking Victims: Challenges for the Child Welfare System*, 33 Evaluation & Program Plan. 311, 312 (2010)). The cited academic article relied, in turn, on a 1999 survey. *See* Fong & Cardoso, *supra*, at 312 (citing Richard J. Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children in the U. S., Canada and Mexico* (Sept. 18, 2001, *revised* Feb. 20, 2002)). Thompson's invocation of this survey, however, is insufficient to sustain his overbreadth challenge. The survey's dataset is limited—the authors recognized that it did not provide sound ground for extrapolation, *see* Estes & Weiner, *supra*, at 130—and, most tellingly, the survey fails to account for situations in which minors' relatives *themselves* prostitute the minors, a circumstance that the survey authors recognized as realistic, *see id.* at 69–70.

## II.     Adequacy of the indictment

Thompson next argues for reversal of his conviction under section 1591(a) and (b)(1) for sex trafficking of a child under the age of fourteen, contending that the indictment failed to allege that he knew M1 was under age 14, a *mens rea* element that he claims was required to support conviction. The District Court rejected this contention. *See Thompson*, 141 F. Supp. 3d at 200–01. We review that conclusion *de novo*. *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

As relevant here, section 1591(a)—set forth more fully above, *see supra* Discussion Part I—establishes criminal liability for a person who "knowingly . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person" (the first *mens rea* requirement) "knowing, or in reckless disregard of the fact . . . that the person has not attained the age of 18 years" (the second *mens rea* requirement) "and will be caused to engage in a commercial sex act" (the third *mens rea* requirement). 18 U.S.C. § 1591(a) (2014). Section 1591(b), in turn, prescribes the "punishment[s] for an offense under subsection (a)," increasing the penalty for cases in which the minor victim was especially young. That penalty is:

> (1) if the offense was effected by means of force, threats of force, fraud, or coercion . . . , or by any combination of such means, *or if the person recruited, enticed, harbored, transported, provided, or obtained had not attained the age of 14 years at the time of such offense*, by a fine under this title and *imprisonment for any term of years not less than 15 or for life*; or
>
> (2) if the offense was not so effected, and *the person recruited, enticed, harbored, transported, provided, or obtained had attained the age of 14 years but had not attained the age of 18 years* at the time of such offense, by a fine under this title and *imprisonment for not less than 10 years or for life*.

*Id.* § 1591(b) (emphases added).

20

Count One of the indictment charged a violation of section 1591(a) and (b)(1). It alleged three *mens rea* elements: first, that Thompson "did knowingly and intentionally recruit, entice, harbor, transport, provide, obtain and maintain by any means" a minor victim, M1 (the first section 1591(a) *mens rea* element); second, that he "engaged in such acts, knowing, and in reckless disregard of the fact, that [M1] had not attained the age of 18 years" (the second section 1591(a) *mens rea* element); and third, that he "engaged in such acts, knowing, and in reckless disregard of the fact, that [M1] . . . would be caused to engage in one or more commercial sex acts" (the third section 1591(a) *mens rea* element). Appellant's App. at 18–19. It further alleged, with reference to section 1591(b)(1), that M1 "had not yet attained the age of 14 years," but did not allege any mental state as to that fact.[16] Appellant's App. at 18.

Thompson argues that imposition of the enhanced penalty established by section 1591(b)(1) requires proof that the defendant knew not only that the victim was

---

[16] More completely, Count One of the indictment charged Thompson as follows:

> On or about and between April 10, 2013 and July 25, 2013, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ALVAUN THOMPSON, also known as "LP," "Love Pimpin" and "AT," together with others, did knowingly and intentionally recruit, entice, harbor, transport, provide, obtain and maintain by any means a person, to wit: Jane Doe #1, an individual whose identity is known to the Grand Jury, and who had not yet attained the age of 14 years, in and affecting interstate and foreign commerce, and benefit, financially and by receiving things of value, from participation in a venture that engaged in such acts, knowing, and in reckless disregard of the fact, that Jane Doe #1 had not attained the age of 18 years and would be caused to engage in one or more commercial sex acts. (Title 18, United States Code, Sections 1591(a)(1), 1591(a)(2), 1591(b)(1), 2 and 3551 et seq.).

Appellant's App. at 18–19.

under 18 years of age, as required for conviction under section 1591(a), but also that the defendant knew or recklessly disregarded that the minor victim was under fourteen years of age. We are not persuaded.

Read literally, the statute defining the crime, section 1591(a), contains a single *mens rea* requirement regarding the age of the victim: "know[ledge], or . . . reckless disregard of the fact . . . that the person has not attained the age of 18 years." The text demands no additional *mens rea* to support the increased punishment imposed in section 1591(b)(1) for "an offense under subsection (a)" concerning a victim under age 14. The indictment in this case alleged that one of the two minor victims was *in fact* under the age of 14 and that Thompson *knew* she was under 18; by the literal language of the statute, this charge is sufficient. *See United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013) ("[W]e have consistently upheld indictments that do little more than to track the language of the statute charged . . . ." (internal quotation marks omitted)).

Thompson observes that courts have on occasion engrafted additional *mens rea* requirements onto a criminal statute notwithstanding congressional silence and urges us to do so here. By way of illustration, he correctly cites several cases in which we and the Supreme Court have applied *mens rea* requirements that appear in one part of a criminal statute to other elements of the offense of conviction. But the circumstances present in those cases are not here. For example, in *Flores-Figueroa v. United States*, 556 U.S. 646 (2009), the Supreme Court considered a statute imposing a mandatory minimum sentence if "the offender 'knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person.'" 556 U.S. at 647 (emphasis omitted) (quoting 18 U.S.C. § 1028A(a)(1)). It construed the statute to contain a broad *mens rea* requirement, explaining that "it seems natural to read the statute's word 'knowingly' as applying to *all* the subsequently listed elements of the crime." *Id.* at 650 (emphasis added). We cannot say the same, however, of section 1591: unlike 18

22

U.S.C. § 1028A, section 1591 separates into different subdivisions the *mens rea* requirement Thompson seeks to impose and the increased penalty based on the victim's age.

Although courts are generally "reluctan[t] to simply follow the most grammatical reading of the statute" where general principles of Anglo-American criminal law would suggest that a *mens rea* requirement ought to attach to certain elements of a crime, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 70 (1994) (discussing *Morissette v. United States*, 342 U.S. 246, 255 (1952)), there is no common law tradition that crimes involving sexual offenses against minors invariably require a specific mental state with respect to the victim's age. Indeed, in *United States v. Robinson*, 702 F.3d 22 (2d Cir. 2012), we rejected a defendant's challenge to jury instructions which, in his view, did not correctly articulate the requirements for conviction under 18 U.S.C. § 1591(c). *See* 702 F.3d at 30–34. We discussed in some detail our approach to *mens rea* requirements in the definition of sex crimes involving children, as follows:

> We are mindful that criminal statutes are generally construed to include *mens rea* requirements. But that presumption does not apply to sex crimes against minors, at least when the perpetrator confronts the underage victim personally. Moreover, the presumption applies when someone engages in otherwise innocent conduct, including constitutionally protected conduct, and thus has little purchase for [defendant], who was engaged in sex trafficking.

*Id.* at 32–33 (internal quotation marks, citations, and footnote omitted). Like the defendant in *Robinson*, Thompson engaged in sex trafficking (and personally confronted his underage victims), and thus the presumption does not apply. Nor would the absence of an additional *mens rea* requirement in the minor victim trafficking provision permit prosecution of an individual who did not have "knowledge of wrongdoing sufficient to support the finding of *mens rea* ordinarily necessary to impose criminal

23

responsibility on a defendant." *United States v. Bronx Reptiles, Inc.*, 217 F.3d 82, 88 (2d Cir. 2000) (holding that defendant must act with knowledge of "inhumane or unhealthful conditions" of animal importation to sustain conviction under 18 U.S.C. § 42(c)). Indeed, where, as here, the statute concerns the exploitation of children, imposition of strict criminal liability with regard to the age of a victim is not out of the ordinary, as we have observed elsewhere. *See Robinson*, 702 F.3d at 33 ("[F]ederal child-protective statutes . . . have been interpreted to lack [ ] *mens rea* requirements with respect to [the victim's] age." (alterations in original) (internal quotation marks omitted)).

Because it alleged the *mens rea* necessary for conviction under section 1591(a) and (b)(1), the indictment adequately charged a violation of those provisions.

## III.   Venue

Finally, Thompson contends that the government offered insufficient evidence to support the jury's determination that venue properly lay in the Eastern District of New York for his trial on charges of sexual exploitation of a child through the production of child pornography, in violation of 18 U.S.C. § 2251(a). Section 2251(a) provides in relevant part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, . . . with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished . . . .

18 U.S.C. § 2251(a).

For each count of an indictment, the government bears the burden of proving by a preponderance of the evidence that venue is proper. *United States v. Tzolov*, 642 F.3d

314, 318 (2d Cir. 2011). When a defendant challenges the propriety of the trial venue after conviction by a jury, however, we "review the sufficiency of the evidence as to venue in the light most favorable to the government," crediting "every inference that could have been drawn in its favor." *Id.* (internal quotation marks omitted). If "the facts are not in dispute, venue challenges raise questions of law, which we review *de novo*." *Id*.

The Constitution requires that "[t]he Trial of all Crimes . . . be held in the State where the said Crimes shall have been committed . . . ." U.S. Const. art. III, § 2, cl. 3. In Rule 18, the Federal Rules of Criminal Procedure echo that directive: "Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Congress has further effected the constitutional requirement by statute, permitting "offense[s] . . . begun in one district and completed in another . . . [to] be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Accordingly, we have instructed that "[v]enue may lie in more than one place if the acts constituting the crime and the nature of the crime charged implicate more than one location." *United States v. Lange*, 834 F.3d 58, 68 (2d Cir. 2016) (internal quotation marks omitted); *see also United States v. Holcombe*, 883 F.3d 12, 15 (2d Cir. 2018).

In support of its prosecution of Thompson under section 2251(a), the government offered evidence that Thompson filmed himself engaging in sex acts with the younger of the minor victims on December 14, 2014, in the Bronx, a part of New York's Southern District, where venue of a prosecution based on those acts would plainly have been proper. The government maintained, however, that venue for this prosecution properly lay also in the Eastern District of New York, where Thompson was tried for the other crimes that we have described, related to the prostitution of M1 and M2. The government argued to the jury that venue in the Eastern District was proper based on

25

evidence that at least part of the *actus reus* of the crime—the persuasion, inducement, enticement, or coercion of the minor victim who appeared in the video—occurred in Brooklyn, within the Eastern District of New York. The government responds to Thompson's challenge to venue on appeal by arguing that the jury reasonably could have relied on Thompson's earlier enticement or inducement of M1 in the Eastern District to conclude that venue there was proper.

Thompson does not dispute that he violated section 2251(a) when, in the Southern District, he created a video of himself engaging in sexual acts with the younger of the minor victims. Nor does he contend that the jury was incorrectly instructed as to venue.[17] He argues, rather, that his conduct in the Eastern District related to his prostitution of the victim and not to his later creation of the video that was the subject of the prosecution under section 2251(a). Accordingly, he urges, no reasonable jury could find that venue in the Eastern District was proper for the production crime. Thompson so urged the District Court, unsuccessfully, in a Rule 29 motion made at the close of the government's evidence.

Two other circuit courts have recently encountered similar facts and rejected similar arguments. In *United States v. Sullivan*, 797 F.3d 623 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2408 (2016), the government presented evidence that, although the video at issue was produced in the Eastern District of California, the defendant "established and maintained physical and mental control over the relationship between himself and the girl from the time she first entered his car . . . in the Northern District [of California], and [he] used this control to coerce her into making a sex video." 797 F.3d at 631

---

[17] The District Court instructed the jury, in relevant part: "[T]o establish venue for Count Five [charging a violation of 18 U.S.C. § 2251(a)], the Government would have to prove more likely than not an act of the crime was committed at least in part in this district. And this district includes Brooklyn, Queens, Staten Island[,] Nassau[,] and Suffolk Counties." Trial Tr. 776.

(internal quotation marks omitted). The defendant in *Sullivan* maintained that this evidence did not suffice to establish venue, arguing "that his interactions with [the victim] in the Northern District of California were merely preliminary, or were for the sole purpose of recruiting [her] to become a prostitute, and therefore were not essential steps towards making the video." *Id*. The Ninth Circuit reasoned that "the persuasion, inducement, enticement and coercion that led to the video's filming in [the Eastern District of California] had their genesis in the Northern District," making venue in the district of the preceding interactions lawful. *Id.*

Similarly, in *United States v. Engle*, 676 F.3d 405 (4th Cir. 2012), the Fourth Circuit concluded that the government presented sufficient evidence to support a jury's determination that venue lay in the district of prosecution despite the absence of "evidence that [the defendant] directly informed [his victim] from [the district in which he was tried] of his intent or desire to videotape or photograph her engaging in sexually explicit conduct." *Id*. at 418. In that court's view, "a jury could reasonably find by a preponderance of the evidence that [the defendant's] sexually themed communications with [his victim] . . . were part of his effort to 'groom' her for [the] purpose [of making the illicit video], which is sufficient to establish enticement under § 2251(a)." *Id*.

We find the reasoning of these courts persuasive. Although the video in question here was created in the Southern District of New York, the government offered evidence that, over a lengthy period—from early 2013 until December 2014, when the video was made—Thompson enticed and groomed M1 in the Eastern District of New York, training this teenager to do his bidding. The grooming involved M1's prostitution in the Eastern District of New York at his behest, and Thompson's sending lewd photographs of other minors to M1 while both he and M1 were in Brooklyn.

27

And the jury heard ample evidence from which it could reasonably find—particularly given that it was required to make the finding only by a preponderance of the evidence—that these actions had precisely the effect that Thompson intended and the government described: namely, that they "entice[d]" or "induce[d]," 18 U.S.C. § 2251(a), M1 to participate in the sex acts recorded in the video. In line with this understanding, we note that the government presented evidence showing that, just two months before he produced the video, M1 sent Thompson a Facebook message that laid bare both Thompson's power over her and her conflicted feelings towards him. She wrote: "I haven't stop thinkin. About u or the thought of touching you or the thought of putting dollars in ya pocket u say I'm your number one b**** why I don't feel like it." Government App. at 63. Thompson's manipulation over the previous eighteen months rendered M1 (only fifteen years old at the time the video was produced) susceptible to the request (or demand) that was to come.

Thus, the jury could reasonably have determined Thompson enticed M1 in Brooklyn, and that his acts in the Eastern District over the previous 20 months laid the groundwork for the video made in the Bronx, in the Southern District. The jury could reasonably rely on this determination to conclude that the government established venue for the crime. *See Sullivan*, 797 F.3d at 631; *Engle*, 676 F.3d at 418.

Thompson resists this conclusion, contending that it relies on too sweeping a conception of "enticement" to support venue. Our precedent, however, supports applying a broad definition of enticement in this context: that definition would reasonably include Thompson's grooming of the minor victims to act as he desired with regard to many matters over the months before he made the video. *See United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010) (concluding that photos were "intended to entice a minor" because they "were sent as part of a grooming process" (internal quotation marks omitted)); *United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006) ("[The

28

defendant's] grooming behavior provide[s] additional evidence in support of the jury's finding that [he] attempted to entice a minor."). We thus have little trouble concluding that the jury could reasonably have found that Thompson's activity with M1 in the Eastern District, before he created the video, "persuade[d], induce[d], [or] entice[d]," 18 U.S.C. § 2251(a), M1 to engage in the sexual conduct in the video for the purpose of creating that depiction, *see Engle*, 676 F.3d at 418 (citing *Dorvee*, 616 F.3d at 180; *Brand*, 467 F.3d at 203).

Thompson cites principally to two cases in support of his contrary position. Both are readily distinguishable. First, in *United States v. Broxmeyer*, 616 F.3d 120 (2d Cir. 2010), we reversed a defendant's conviction under section 2251(a) not for want of venue, but because the record contained no evidence that the defendant "inspired" the production of the photos at issue. *See* 616 F.3d at 124–27 ("[W]hether [the photos at issue] were taken before or after [Broxmeyer] solicited photos of her[ ]one can only guess."). We face no such sequencing question here. Second, Thompson points to *United States v. Sirois*, 87 F.3d 34 (2d Cir. 1996), in which we held that "a jury [could] find a violation of § 2251(a) so long as the evidence shows that illegal sexual activity for the production of visual depictions of that activity was one of the dominant motives for the interstate transportation of the minors, and not merely an incident of the transportation." 87 F.3d at 39. There, however, we were called to opine on the motive that caused the defendant to have the minors transported across state lines, rather than to draw the contours of "entice[ment]," as that word is used in section 2251. In addition, reading *Sirois* as broadly as Thompson invites us to would put that decision in tension with our more recent discussions of grooming as a form of "entice[ment]." *See Dorvee*, 616 F.3d at 180; *see also United States v. Weisinger*, 586 F. App'x 733, 736 (2d Cir. 2014) (summary order) (affirming district court's admission of evidence about minor victim's "past physical abuse" because such evidence was "probative to demonstrate how

29

[defendant] gained control over the minor victim and how he groomed her to participate in and transmit the charged pornographic images of herself"). We are bound here by our decision in *Dorvee*, and decline Thompson's invitation to introduce such tension into our caselaw.

Because the government offered sufficient evidence for the jury to conclude that venue properly lay in the Eastern District of New York, we reject Thompson's challenge to his conviction under 18 U.S.C. § 2251(a).

## CONCLUSION

We have considered Thompson's remaining arguments and find them to be without merit. We therefore **AFFIRM** the judgment of the District Court.